[No. C058975. Third Dist. Dec. 2, 2009.]

BRUCE D. DONLEY, Plaintiff and Appellant, v.
JEFF DAVI, as Commissioner, etc., Defendant and Respondent.

Counsel

Timothy E. Hodgson for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Paul D. Gifford, Assistant Attorney General, William L. Carter and Jeffrey A. Rich, Deputy Attorneys General, for Defendant and Respondent.

## Opinion

**CANTIL-SAKAUYE, J.**—Jeff Davi, as commissioner of California's Department of Real Estate (DRE) (Commissioner), denied Bruce D. Donley's application for an unqualified real estate salesperson license, issuing to him instead a restricted license. Donley filed a petition for writ of administrative mandamus (Code Civ. Proc., § 1094.5) challenging the Commissioner's decision, claiming he was entitled to an unrestricted license. The trial court denied Donley's petition and entered judgment for the Commissioner. Donley appeals claiming: his 2003 misdemeanor conviction of Penal Code section 273.5 (willful infliction of corporal injury on his cohabitant/mother of his child—hereafter section 273.5) is not a crime of moral turpitude; such conviction is not substantially related to the qualifications, functions, and duties of a real estate salesperson licensee; and in any event, he is rehabilitated under the DRE's published criteria. (Cal. Code Regs., tit. 10, § 2911.) Donley also raises several evidentiary objections to the documentary evidence submitted by the DRE. We shall affirm the judgment.

## BACKGROUND

*The Misdemeanor*

Donley and his girlfriend Lori Kit Riddle got into a heated argument one evening in August 2003. El Dorado County Sheriff's officers responded to Riddle's 911 call.

Sheriff's Deputy Ford wrote a report that included a summary of Riddle's statement to the officers. Riddle told the officers she and Donley had been living together for five years and that they had a four-year-old son, J. According to Riddle, she and Donley had an argument in the kitchen that evening about her reorganizing the office space upstairs. During their argument, Donley pushed her to the ground several times. Riddle eventually left

the house through the kitchen door, ran around the house, and came back inside through the front door. Riddle grabbed J. and ran upstairs into the bathroom. Donley followed her upstairs, kicked the closed bathroom door, then opened the door and started yelling at Riddle. Riddle struggled with Donley and Donley pushed her to the floor twice more. Riddle claimed she was holding J. during this time. She claimed Donley took J. away from her and set him on the floor at the top of the stairs. Donley then straddled her and put his right hand around her throat, choking her. After a few seconds, he got up and let go, only to strike her with his hand several times on her face. Donley threw a box of college books at her, striking her in the chest. Riddle called 911 and Donley left the house.[1]

Deputy Ford observed a circular red mark on the inside of Riddle's right elbow. He reported that the area around Riddle's throat was red and slightly swollen. Riddle complained of pain, but declined any medical treatment for herself or J. Ford took photographs of Riddle's injuries, but the photos did not end up showing the injuries well.

Donley turned himself in to the sheriff's department the next day. According to Ford's supplemental report, Donley told Ford he was sitting on the couch watching television when he got up and went into the kitchen to get himself a beer. All of a sudden Riddle started yelling at him about taking the last beer. Riddle had been drinking beer part of the day and Donley thought she might be "drunk." Donley said Riddle pushed him in the chest with both her hands and "dug her nails" into his face, scratching him under his left eye. He said he was afraid of Riddle because she was a brown belt in karate. So he pushed her to the floor to get her off of him. After he knocked Riddle down, she got up, went into the living room, picked up J., and ran upstairs. Donley followed her up the stairs. When he got to the top, Riddle started kicking him in the knees. He pushed her with both of his hands and she fell to the floor landing in the seated position. He reached down and took J. away from her because he was mad Riddle was involving their young child in the fight. Riddle started kicking him in the knees again so he leaned down and put his right hand around her throat in an attempt to stop her from kicking him. He only had his hand on her throat for a few seconds when he let go and went back downstairs. As soon as Riddle dialed 911, Donley left the house because he knew the "cops" were coming and he did not want to go to jail.

Deputy Ford claimed Donley changed his story several times during the interview. According to Ford, Donley could not make up his mind whether Riddle was holding J. during the fight and whether Riddle was sitting or

---

[1] Riddle's 12-year-old son, E.K., gave a statement to Ford that corroborated Riddle's claim to have been chased, pushed to the ground, slapped, and hit with a box of books. At one point, E.K. also saw Donley reach down towards Riddle's head.

standing at the top of the stairs when she was kicking him. Ford observed a small red mark underneath Donley's left eye, which Donley told him was the result of Riddle putting her nails in his face.

A criminal complaint was filed charging Donley with felony violation of section 273.5 and misdemeanor child endangerment in violation of Penal Code section 273a, subdivision (b). Donley entered a plea of no contest to both charges as misdemeanors in December 2003. Donley was placed on three years' informal probation with conditions that included service of two days in jail, payment of a fine, completion of a 52-week batterers' program, and a prohibition on consumption, possession or control of alcohol.

Donley successfully completed his probation, satisfying all terms and conditions. In December 2006, the superior court entered an order pursuant to Penal Code section 1203.4 expunging both his convictions.

*Donley's Application to the DRE*

Donley applied to the DRE for a real estate salesperson license. Donley disclosed his convictions. The Commissioner filed a statement of issues contending Donley's convictions constituted cause for denial of his application for a license and the matter was set for hearing.

At the hearing before the administrative law judge (ALJ), the DRE submitted a number of documentary exhibits supporting a denial of a license to Donley. Donley did not object to most of the evidence, but did object based on hearsay, lack of foundation and competency to the admission of the sheriff department's report that contained the statements of Riddle, E.K., and Donley, as well as the officer's observations. The ALJ overruled the objections. The ALJ concluded Donley's admissions and the officer's observations could come in for all purposes and the remainder of the report, although hearsay, was admissible in an administrative proceeding subject to the rule that it could not support a finding by itself.

Donley also objected to the admission of a DRE form called a Conviction Detail Report (form 515D), which contained a brief summary of the details of Donley's offenses. Such summary outlined the conflict between Donley and Riddle in the kitchen, but omitted any details of what happened upstairs, stating only that "[i]n the words of P.C. 273.5 I wil[l]fully inflicted upon the mother of my child, corporal injury resulting in a traumatic condition." The summary states J. observed the fight, which constituted "mental suffering" "in

the words of P.C. 273a(b)," but Donley caused neither Riddle nor J. any physical harm. Donley objected that this summary did not qualify as a judicial admission because it was prepared by his counsel and not signed by him. With that "proviso" Donley agreed to go ahead and supplement the summary with his testimony. The document was admitted with Donley's reservation.

*Donley's Testimony at the Hearing*

Donley testified on his own behalf at the administrative hearing. Donley testified the fight with Riddle started when Riddle, who had a few beers more than Donley, went into the kitchen for another beer, "freaked out" because there were none left, and started arguing with, scratching, and kicking Donley because he would not give her the last beer. Riddle pushed and shoved Donley into the cabinets, causing him to hit his head. Donley admitted he pushed Riddle with his hand and she fell to the floor.

Donley testified he told Riddle to go out the door. He wanted her to leave the house because the fight was not going to stop until they separated. Donley said his statement to officers that Riddle went from the kitchen into the living room, picked up J., and ran upstairs was not true. Donley claimed Riddle ran out the back door, came around the house, and then ran back in the front door and upstairs. Donley claimed he and his son followed her up the stairs. Asked why he ran upstairs if he was afraid of Riddle's karate skills, Donley testified they were in an argument, so he ran upstairs to continue the argument. He said it "was a mistake" and that he "was exhibiting extremely poor judgment."

Donley testified he entered the bathroom and started yelling at Riddle. When Riddle tried to go around him, he admitted he pushed her to the floor. Donley stated he pushed Riddle down by the shoulder. He never had a hold of her neck. He never choked her. Donley said he did not see the photos taken by the officers, but Riddle's throat would not have had any red marks because he did not choke her and, if there were red marks, he did not put them there. His statement in the officer's report that he had his hand around Riddle's throat was not true.

As Riddle stood up, Donley admitted he threw a box of college books at her. Donley denied striking Riddle in the face. He said he struck her on the shoulder. He admitted he slapped her.

Donley claimed Riddle was not holding J. when they were upstairs. J. was, however, present. According to Donley, J. ran up the stairs and tried to get in between Donley and Riddle to break up their fight. Donley picked him up and moved him out of the way before he could be knocked down the stairs.

Donley testified he never intended to harm Riddle or J. at any time. He did not act with the intent or threat of doing substantial injury to Riddle and no substantial injury was done. He admitted responsibility for his part in the domestic violence. He testified he had no history of conduct similar to this and has never been convicted of any other crime. He and Riddle separated after this incident and no longer live together. They are friends and amicably share custody of J. Donley introduced a letter of recommendation from Riddle in which Riddle described the incident as "an argument that resulted in the involvement of law enforcement. Neither of us were [sic] to blame. It was a simple misunderstanding that escalated far beyond where it should have gone." Donley testified he agreed with this description of what happened. Although neither of them was to blame, he said he takes responsibility for it.

*The Commissioner Grants Donley a Restricted License*

The ALJ issued a proposed decision denying Donley an unrestricted salesperson license, but recommending the issuance of a conditional and restricted license. The Commissioner notified Donley that he was not adopting the ALJ's proposed decision. After further briefing by the parties, the Commissioner filed an "Amended Decision After Rejection" (capitalization changed) issuing Donley a restricted license based on findings that defendant's section 273.5 conviction was a crime of moral turpitude, the offense was substantially related to the duties of a licensee, and Donley was only partially rehabilitated. The trial court found substantial evidence supported the findings of the Commissioner and denied Donley's challenge to the Commissioner's decision.

## DISCUSSION

### I.

### Standard of Review

Donley sought review of the decision of the Commissioner denying him an unrestricted real estate salesperson license by a petition for administrative mandamus pursuant to Code of Civil Procedure section 1094.5.[2] In reviewing

---

[2] "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).)

administrative proceedings under section 1094.5 that do not affect a fundamental right, such as an attempt to obtain a license to engage in a profession or business, the trial court reviews the whole administrative record to determine whether the findings are supported by substantial evidence and whether the agency committed any errors of law. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 144 [93 Cal.Rptr. 234, 481 P.2d 242]; *Berg v. Davi* (2005) 130 Cal.App.4th 223, 228 [29 Cal.Rptr.3d 803]; *Harrington v. Department of Real Estate* (1989) 214 Cal.App.3d 394, 404–405 [263 Cal.Rptr. 528].) On appeal in such a case, we stand in the same shoes as the trial court and apply the same standard of review. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632 [29 Cal.Rptr.2d 191].)

Under the substantial evidence test, the agency's findings are presumed to be supported by the administrative record and, in both the trial court and here on appeal, it is the petitioner/appellant's burden to show they are not. (*SP Star Enterprises, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 459, 469 [93 Cal.Rptr.3d 152]; *Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 335–336 [25 Cal.Rptr.2d 842].) We " 'do not reweigh the evidence; we indulge all presumptions and resolve all conflicts in favor of the [agency's] decision. Its findings come before us "with a strong presumption as to their correctness and regularity." [Citation.]' " (*California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 584 [128 Cal.Rptr.2d 514].) When more than one inference can be reasonably deduced from the facts, we cannot substitute our own deductions for that of the agency. (*SP Star Enterprises, Inc. v. City of Los Angeles, supra*, at p. 469.) We may reverse an agency's decision only if, based on the evidence before it, a reasonable person could not have reached such decision. (*California Youth Authority v. State Personnel Bd., supra*, at p. 584; *Kirkorowicz v. California Coastal Com.* (2000) 83 Cal.App.4th 980, 986 [100 Cal.Rptr.2d 124].)

## II.

### Donley's Section 273.5 Conviction Is a Crime Involving Moral Turpitude

At the time of Donley's application and the Commissioner's decision on his application, Business and Professions Code former section 10177 provided the Commissioner authority to deny the issuance of a license to an applicant who had "[e]ntered a plea of guilty or nolo contendere to, or been found guilty of, or been convicted of, a felony or *a crime involving moral turpitude*, and the time for appeal has elapsed or the judgment of conviction

has been affirmed on appeal, irrespective of an order granting probation following that conviction, suspending the imposition of sentence, or of a subsequent order under Section 1203.4 of the Penal Code allowing that licensee to withdraw his or her plea of guilty and to enter a plea of not guilty, or dismissing the accusation or information."[3] (Bus. & Prof. Code, former § 10177, subd. (b), italics added.)

In denying Donley an unrestricted license, the Commissioner concluded that: "An act of domestic violence does not inherently involve moral turpitude, as it can occur 'without a readiness to do evil,' and can occur when tempers flare out of control. There exists a wide variety of gradations and relative reprehensiveness of conduct that can still constitute a violation of Penal Code section 273.5. However, regardless of how serious the conduct, section 273.5 cannot be violated without a breach of the trust relationship the perpetrator enjoys with a cohabitant or a spouse, and that perpetrator commits an act of physical violence upon the other in violation of that trust. [Donley's] first exchange with Ms. Riddle, although physical, probably would not have reflected moral turpitude, had the incident ended there. But he followed her upstairs and pressed the conflict, after having had ample opportunity to reflect upon the first exchange and remain disengaged. [Donley] became the aggressor and physically reengaged with Ms. Riddle, which behavior constitutes conduct involving moral turpitude."

Donley agrees with the Commissioner's conclusion that section 273.5 does not necessarily involve moral turpitude, but disagrees with the Commissioner's conclusion that his specific section 273.5 offense was committed with moral turpitude. Donley argues the evidence does not support a finding that his commission of the section 273.5 offense involved moral turpitude. Donley emphasizes his lack of intent to inflict substantial harm on Riddle, his lack of intent to injure J., and the fact that no substantial physical harm resulted to either Riddle or J. He claims his "poor judgment" and violation of the trust relationship between himself and Riddle do not constitute moral turpitude. He categorically denies the Commissioner's finding that he had ample opportunity to reflect upon the situation and cease his behavior. The Commissioner disagrees, arguing section 273.5 is a crime involving moral turpitude generally and that there is substantial evidence to support the conclusion Donley's specific offense involved moral turpitude. We agree with the Commissioner.

---

[3] (Bus. & Prof. Code, former § 10177, amended by Stats. 1961, ch. 886, § 18, eff. June 28, 1961 and by Stats. 2007, ch. 140, § 1; Bus. & Prof. Code, § 480, subd. (a)(1), (3)(B) [a board may deny a license on the grounds that the applicant has been convicted of a crime if the crime is substantially related to the qualifications, functions, or duties of the business or profession for which the application is made].) Under the current statute a finding of moral turpitude is no longer required. The DRE does not dispute the applicability of the former statute to this case.

■ "Moral turpitude" is defined as the " 'general readiness to do evil.' " (*People v. Castro* (1985) 38 Cal.3d 301, 313–316 [211 Cal.Rptr. 719, 696 P.2d 111] (*Castro*).) In deciding whether a criminal conviction involves moral turpitude, the question is whether one can reasonably infer the presence of moral turpitude (a general readiness to do evil) from the " 'least adjudicated elements' " of the offense—without regard to the facts of the particular violation. (*People v. Campbell* (1994) 23 Cal.App.4th 1488, 1492 [28 Cal.Rptr.2d 716]; see *Castro, supra,* at p. 317.)

Section 273.5 reads, in pertinent part: "(a) Any person who willfully inflicts upon a person who is his or her spouse, former spouse, cohabitant, former cohabitant, or the mother or father of his or her child, corporal injury resulting in a traumatic condition, is guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the state prison . . . , or in a county jail . . . , or by a fine . . . or by both that fine and imprisonment. [¶] . . . [¶] (c) As used in this section, 'traumatic condition' means a condition of the body, such as a wound or external or internal injury, whether of a minor or serious nature, caused by a physical force."

In *People v. Rodriguez* (1992) 5 Cal.App.4th 1398 [7 Cal.Rptr.2d 495], the court held section 273.5 was a crime involving moral turpitude. The court stated: "We perceive the crux of *Castro*'s definition to be the requisite animus of the felon: Must the crime be attended by knowledge of circumstances and a conscious decision to exploit them sufficient to signify readiness to do evil? To violate Penal Code section 273.5 the assailant must, at the very least, have set out, successfully, to injure a person of the opposite sex in a special relationship for which society rationally demands, and the victim may reasonably expect, stability and safety, and in which the victim, for these reasons among others, may be especially vulnerable. To have joined in, and thus necessarily to be aware of, that special relationship, and then to violate it wil[l]fully and with intent to injure, necessarily connotes the general readiness to do evil that has been held to define moral turpitude." (*People v. Rodriguez, supra,* at p. 1402.)

■ To the extent Donley is asserting his conviction for section 273.5 is not a crime of moral turpitude because he lacked specific intent to injure Riddle or J., such argument is beside the point. The distinction between specific and general intent crimes is irrelevant to the question of moral turpitude. (*People v. Campbell, supra,* 23 Cal.App.4th at p. 1493.) And, section 273.5 is a general intent crime. (*People v. Thurston* (1999) 71 Cal.App.4th 1050, 1055 [84 Cal.Rptr.2d 221]; *People v. Campbell* (1999) 76 Cal.App.4th 305, 308 [90 Cal.Rptr.2d 315].) Further, numerous general intent crimes have been classified as involving moral turpitude. (*People v. Campbell, supra,* 23 Cal.App.4th at p. 1493, citing, e.g., *People v. White* (1992) 4

Cal.App.4th 1299, 1301 [6 Cal.Rptr.2d 259] [Pen. Code, § 246 (shooting at inhabited building)]; *People v. Brooks* (1992) 3 Cal.App.4th 669, 671 [4 Cal.Rptr.2d 570] [Pen. Code, § 273d (corporal punishment of child resulting in trauma)]; *People v. Zataray* (1985) 173 Cal.App.3d 390, 400 [219 Cal.Rptr. 33] [Pen. Code, § 207 (simple kidnapping)].)

■ We find "a readiness to do evil" is present in a section 273.5 violation because the offense is defined by a willful infliction of injury upon, as *Rodriguez* put it, "a person of the opposite sex in a special relationship for which society rationally demands, and the victim may reasonably expect, stability and safety, and in which the victim, for these reasons among others, may be especially vulnerable." (*People v. Rodriguez, supra*, 5 Cal.App.4th at p. 1402.) It is the assailant's awareness of this special relationship and willful abuse of such relationship by the use of violence that demonstrates moral turpitude.[4] (See also *People v. Lindsay* (1989) 209 Cal.App.3d 849, 857 [257 Cal.Rptr. 529] ["the intentional, willful and unlawful use of force upon a peace officer, however slight, coupled with *actual* knowledge the victim is a peace officer in the performance of his or her duties, is clearly a crime of moral turpitude . . ."]; *People v. Williams* (1985) 169 Cal.App.3d 951, 957 [215 Cal.Rptr. 612] ["battery by a jail inmate upon a noninmate, a crime of violence, demonstrates 'a general readiness to do evil,' and thus moral turpitude"].)

We acknowledge Donley pled no contest to a misdemeanor violation of section 273.5. It does not matter that his conviction is for a misdemeanor rather than a felony. The "readiness to do evil" lies not in the severity of the injury inflicted, but in the violation of the special relationship between, in this case, cohabitants and parents of a child by use of physical force.

To argue against the conclusion that section 273.5 is a crime of moral turpitude as a matter of law, Donley relies on four cases, *Petropoulos v. Department of Real Estate* (2006) 142 Cal.App.4th 554 [47 Cal.Rptr.3d 812], superseded by statute as stated in *Robbins v. Davi* (2009) 175 Cal.App.4th 118, 123, footnote 5 [95 Cal.Rptr.3d 792] (*Petropoulos*), *In re Otto* (1989) 48 Cal.3d 970 [258 Cal.Rptr. 383, 772 P.2d 558] (*Otto*), *Idowu v. Dept. of*

---

[4] We emphasize that we do not find moral turpitude in the willfulness of the act alone. " '[I]t is well settled that the terms "willful" or "willfully," when applied in a penal statute, require only that the illegal act or omission occur "intentionally," without regard to motive or ignorance of the act's prohibited character. [Citations.]' [Citation.] Willfully implies no evil intent; ' "it implies that the person knows what he is doing, intends to do what he is doing and is a free agent." [Citation.]' [Citation.]" (*People v. Bell* (1996) 45 Cal.App.4th 1030, 1042–1043 [53 Cal.Rptr.2d 156].) The use of the word "willfully" in a penal statute usually defines a general criminal intent crime. (*People v. Bell, supra*, at p. 1043.)

*Real Estate* (Aug. 6, 2004, A101573) (nonpub. opn.) (*Idowu*), and *Morales-Garcia v. Holder* (9th Cir. 2009) 567 F.3d 1058 (*Morales-Garcia*). None are persuasive.

*Petropoulos, supra*, 142 Cal.App.4th 554, did not involve section 273.5. Petropoulos was convicted of two misdemeanor batteries under Penal Code section 242. (*Petropoulos, supra*, at p. 556.) The DRE conceded misdemeanor battery is not a crime of moral turpitude. (*Ibid.*) On appeal two issues were raised: (1) the statutory authorization for the DRE to revoke Petropoulos's license for the commission of a misdemeanor not involving moral turpitude, and (2) the sufficiency of the evidence to establish a substantial relationship between the offense and Petropoulos's duties as a licensee. (*Ibid.*) *Petropoulos* has no application to our consideration of whether section 273.5 involves moral turpitude.

In *Otto, supra*, 48 Cal.3d 970, a State Bar report regarding an attorney convicted of two misdemeanors (Pen. Code, §§ 245, subd. (a) [assault by means likely to produce great bodily injury] & 273.5) stated the facts and circumstances did not involve moral turpitude, but did constitute misconduct warranting discipline. (*Otto, supra*, at p. 971.) The Supreme Court agreed the facts amounted to misconduct warranting discipline and so did not consider the State Bar's conclusion regarding moral turpitude. (*Id.* at pp. 971–972.) Cases are not authority for propositions not considered and decided. (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620 [71 Cal.Rptr.2d 830, 951 P.2d 399]; *Murphy v. City of Alameda* (1992) 11 Cal.App.4th 906, 914 [14 Cal.Rptr.2d 329].)

Donley claims he is entitled to cite and rely on the unpublished opinion of *Idowu, supra*, A101573, under the exception stated in rule 8.1115 of the California Rules of Court for "[w]hen the opinion is relevant to a . . . *disciplinary action* because it states reasons for a decision affecting the same defendant or respondent in another such action." (Rule 8.1115(b)(2), italics added.) We question the applicability of such rule here to a challenge to the Commissioner's refusal to issue a license, but need not resolve the issue because, in any event, the decision is inapposite. The decision considered only whether Idowu's section 273.5 conviction was substantially related to the duties of a real estate licensee and the sufficiency of the evidence to support the Commissioner's conclusion that Idowu was not rehabilitated. The case is not relevant to the question of whether section 273.5 involves moral turpitude, an issue which apparently was not contested in *Idowu*.

*Morales-Garcia, supra*, 567 F.3d 1058, concluded section 273.5, subdivision (a), is not "categorically" a crime involving moral turpitude, precluding cancellation of removal under the federal immigration statute.

(*Morales-Garcia, supra,* at p. 1060.) We are not persuaded by the Ninth Circuit's analysis (*id.* at pp. 1062–1066), which is not binding on us. (*People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *Howard Contracting, Inc. v. G. A. MacDonald Construction Co.* (1998) 71 Cal.App.4th 38, 52 [83 Cal.Rptr.2d 590] ["federal decisional authority is neither binding nor controlling in matters involving state law"].)

■ We conclude section 273.5 is a crime of moral turpitude as a matter of law. Even if we were to consider the underlying facts, which Donley asserts do not support a finding of moral turpitude, we would also find the Commissioner's decision to be supported by substantial evidence.

The Commissioner concluded, in relevant part, that Donley's "first exchange with Ms. Riddle, although physical, probably would not have reflected moral turpitude, had the incident ended there. But he followed her upstairs and pressed the conflict, after having had ample opportunity to reflect upon the first exchange and remain disengaged. [Donley] became the aggressor and physically reengaged with Ms. Riddle, which behavior constitutes conduct involving moral turpitude."

Before we discuss the evidence supporting this conclusion, we consider Donley's evidentiary objection to the admission of the sheriff department's report in the administrative hearing. Donley objected that the report was hearsay and lacked foundation and competency. On appeal Donley continues to assert the report contains multiple levels of hearsay that cannot be considered over his objection.

■ The sheriff department's report and Ford's personal observations in the report are admissible evidence under the hearsay exception for official public records. (Evid. Code, § 1280; *McNary v. Department of Motor Vehicles* (1996) 45 Cal.App.4th 688, 694–695 [53 Cal.Rptr.2d 55], superseded by statute on another point as stated in *Bledsoe v. Biggs Unified School Dist.* (2008) 170 Cal.App.4th 127, 141, fn. 11 [88 Cal.Rptr.3d 13].) Donley's statements to Ford, included in the report as a supplemental narrative, are admissible under the hearsay exception for admissions. (Evid. Code, § 1220.) Riddle's statements to Ford, included in the sheriff department's report, are hearsay to which no exception applies. However, Government Code section 11513, subdivision (c), provides that administrative hearings "need not be conducted according to technical rules relating to evidence and witnesses, except as hereinafter provided. Any relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of the evidence over objection in civil actions." A victim's statement to investigating officers

is such a type of evidence. Subdivision (d) of Government Code section 11513 provides that hearsay "may be used for the purpose of supplementing or explaining other evidence," with the qualification that over timely objection such hearsay "shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions."

Considering the record with these principles in mind, it is apparent the Commissioner's finding that Donley's conduct amounted to moral turpitude is supported by substantial evidence. Donley's own statements reflect he and Riddle (his cohabitant and the mother of his son) became involved in an argument that escalated to physical violence. Donley admitted in his testimony before the ALJ that he told Riddle to leave the house, recognizing their fight "wasn't going to stop until we separated." Riddle left the house. This should have concluded the matter. However, when Riddle came back into the house and proceeded upstairs, Donley testified he "wanted to continue the argument with her." Despite knowing their argument had already become physical, despite his recognition that they needed to separate to stop the fight, despite being afraid of Riddle's karate skills and despite having already been hurt by Riddle, Donley ran upstairs to continue the argument because he felt wronged. By his own admissions to Ford and in the hearing before the ALJ, once upstairs Donley pushed Riddle to the floor, struck her on the shoulder, slapped her, and threw a box of college books at her, all in the immediate presence of their four-year-old child. Such conduct involved moral turpitude.[5]

Donley complains the record is devoid of any evidence of the time it took for Riddle to leave the house, run around to the front door and reenter the house, so that no evidence supports the Commissioner's finding that he had "ample opportunity to reflect upon the first exchange and remain disengaged." Evidence of the precise time lapse was unnecessary. Even assuming Riddle was out of the house for only a very short time, there was still an opportunity for Donley to reflect. As the trial court aptly explained: "The evidence clearly establishes that there was a break in the conflict when Ms. Riddle left the house. Although the evidence does not address the question of how much time elapsed before she re-entered the house, it is evident, and certainly reasonably can be inferred, that her return was not

---

[5] The Commissioner made a factual finding that "[t]he evidence was insufficient to prove that [Donley] choked Ms. Riddle or that he put his hands around her neck during the scuffle." We disagree. Donley's statement to Ford admitted he put his hands around Riddle's neck. Ford personally observed the area around Riddle's throat was red and slightly swollen. Riddle's statement to Ford could be considered to supplement and explain these properly admitted observations and statement. (Gov. Code, § 11513, subd. (d).) Riddle stated Donley choked her. However, our position in reviewing the Commissioner's decision is not to make new findings, but to review the record to determine if substantial evidence supports the findings he made. Even without the evidence of choking, substantial evidence supports the Commissioner's finding of moral turpitude.

instantaneous. [Donley] thus had an opportunity, with Ms. Riddle out of the house, to reflect on the incident and bring his temper under control. Indeed, [Donley] actually had told Ms. Riddle to leave the house so that the fight would stop, which suggests that at that point he was looking for a way to disengage. Instead, when Ms. Riddle returned, he made a conscious decision to follow her upstairs and resume the argument. That this decision was conscious and intentional is revealed by [Donley's] testimony that he wanted to resume the argument because he felt Ms. Riddle was wrong in what she was doing. Given the existence of the special relationship between [Donley] and Ms. Riddle as described in *People v. Rodriguez, supra*, [5 Cal.App.4th at p. 1402,] [Donley's] revival of the conflict despite a clear opportunity to disengage constitutes moral turpitude."

### III.

### Donley's Section 273.5 Conviction Was Substantially Related to the Qualifications, Functions, and Duties of a Real Estate Salesperson Licensee

██ Business and Professions Code section 480 authorizes the denial of a license by a professional licensing board, including the DRE (Bus. & Prof. Code, § 477, subd. (a)), on the ground that the applicant has been convicted of a crime, "if the crime . . . is substantially related to the qualifications, functions, or duties of the business or profession for which application is made." (Bus. & Prof. Code, § 480, subd. (a)(3)(B).)

Business and Professions Code section 481 requires each board covered by its provisions to "develop criteria to aid it, when considering the denial, suspension or revocation of a license, to determine whether a crime or act is substantially related to the qualifications, functions, or duties of the business or profession it regulates."

The DRE has adopted such a regulation. (Cal. Code Regs., tit. 10, § 2910 (hereafter section 2910).) Section 2910 provides, as relevant here: "(a) When considering whether a license should be denied, suspended or revoked on the basis of the conviction of a crime, . . . *the crime . . . shall be deemed to be substantially related* to the qualifications, functions or duties of a licensee of the Department within the meaning of Sections 480 and 490 of the Code *if it involves*: [¶] . . . [¶] (8) *Doing of any unlawful act with* the intent of conferring a financial or economic benefit upon the perpetrator or with *the intent or threat of doing substantial injury to the person* or property *of another*." (Italics added.)

In denying Donley's application for an unqualified license, the Commissioner made the following relevant findings:

"8. Counsel for [Donley] contends that the convictions do not reflect conduct that is substantially related to the qualifications, functions, and duties of a real estate salesperson licensee. Counsel for [Donley] contends that there is no evidence that any of [Donley's] conduct reflected any threat or intent to inflict substantial injury, within the meaning of . . . section 2910, subdivision [a](8) . . . . The contention lacks merit, even though counsel's contention that there was no proof that [Donley] intended to inflict substantial harm is correct. However, the same cannot be said for [Donley] shoving Ms. Riddle and continuing to physically struggle with her while the four-year-old child was between them, trying to break them up. It was fortuitous neither she nor the child were seriously injured when she fell on her back, with the child still in close proximity. *This conduct did involve the threat of causing substantial harm to both Ms. Riddle and [Donley's] four-year-old son.*" (Italics added.)

Based on this factual finding, the Commissioner reached the legal conclusion that Donley's "behavior posed a threat of causing substantial injury to both Ms. Riddle and his then four-year-old son, within the meaning of [section 2910], subdivision (a)(8)."

Donley claims on appeal that the Commissioner misread section 2910, subdivision (a)(8), in concluding his conduct involved the "threat" of substantial harm. Donley contends the language of section 2910, subdivision (a)(8), that deems a crime to be substantially related to the duties of a real estate licensee when it involves "the intent or threat of doing substantial injury to the person" is limited to situations involving the specific intent to injure, an expressed verbal threat to injure, or conduct that encompasses an intent to injure. He claims the evidence is insufficient to show his offense involved any such intent or "threat" to injure.

■ Consideration of Donley's claim requires us to interpret the language used by the DRE in section 2910, subdivision (a)(8). This court has stated the applicable principles of review as follows: "As a starting point, the interpretation of an administrative regulation is subject to the same principles as the interpretation of a statute. [Citation.] However, there is an important difference between the interpretation of a statute and the interpretation of a regulation. ' "The Legislature has no authority to interpret a statute." ' [Citations.] On the other hand, where the language of the regulation is ambiguous, it is appropriate to consider the agency's interpretation. [Citation.] Indeed, we defer to an agency's interpretation of a regulation involving its area of expertise, ' "unless the interpretation flies in the face of the clear language and purpose of the interpretive provision." [Citation.]' [Citation.]" (*County of Sacramento v. State Water Resources Control Bd.* (2007) 153 Cal.App.4th 1579, 1586–1587 [64 Cal.Rptr.3d 302]; accord, *Communities for a Better Environment v. State Water Resources Control Bd.* (2003) 109 Cal.App.4th 1089, 1104, 1107 [1 Cal.Rptr.3d 76].)

The interpretation of the Commissioner, reflected by his findings and legal conclusion here, is consistent with both the language and purpose of section 2910, subdivision (a)(8).

■ Section 2910 specifies that a conviction involving an unlawful act done with "the intent *or* threat of doing substantial injury" is deemed substantially related to the duties of a licensee. (§ 2910, subd. (a)(8).) The use of the disjunctive "or" suggests the "threat" of doing substantial injury contemplated by the regulation is something different from, or at least includes more than, an act done with the "intent" of doing substantial injury. Thus, it does not appear the regulation is limited, as Donley proposes, to crimes involving a specific intent to substantially injure. Nor does it make sense for the "threat" to be limited to situations where there is an expressed verbal "threat" to substantially injure since in all such situations, the verbal expression would be evidence of the actor's "intent" to injure. General rules of construction require this court to give meaning to each word and phrase and to avoid a construction that makes any part of a regulation superfluous. (*C&C Construction, Inc. v. Sacramento Municipal Utility Dist.* (2004) 122 Cal.App.4th 284, 322 [18 Cal.Rptr.3d 715].) Therefore, it seems most likely that the term "threat" as used in section 2910 encompasses not only an expression of intention to inflict injury, by words or action, but a situation where the unlawful act itself poses an imminent risk of substantial injury. This latter concept is specifically recognized by the dictionary definition of "threat" as including "an indication of something impending." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 1302, col. 1.)

■ Such interpretation of section 2910, subdivision (a)(8), furthers the purpose of the law, as the "principal responsibility" of the Commissioner is to enforce the licensing laws to achieve "the maximum protection for the purchasers of real property and those persons dealing with real estate licensees." (Bus. & Prof. Code, § 10050.) An overly restrictive construction of section 2910 would not provide "maximum protection." (Bus. & Prof. Code, § 10050.)

As so construed, substantial evidence certainly supports the Commissioner's conclusion that Donley's "behavior posed a threat of causing substantial injury to both Ms. Riddle and his then four-year-old son, within the meaning of [section 2910], subdivision (a)(8)." Donley's own testimony admits he engaged in a physical struggle with Riddle, pushing her to the ground, striking her, slapping her, and throwing a box of college books at her, all in the immediate presence of their young son. Indeed, at one point, Donley testified his son J. tried to get in between him and Riddle to break up their fight. Donley said he picked J. up and moved him out of the way "before he got knocked down the stairs." The threat of substantial injury is obvious

when two adults engage in this kind of physical fight at the top of a set of stairs while a very young child unsuccessfully tries to physically intervene.

 Given our conclusion that the Commissioner correctly determined Donley's section 273.5 conviction involved conduct that was substantially related to the qualifications, functions or duties of a real estate salesperson licensee because it came within the meaning of section 2910, subdivision (a)(8), we need not reach Donley's other claims of error regarding the Commissioner's conclusions and the applicability of section 2910.

## IV.

### Substantial Evidence Supports the Commissioner's Finding That Donley Was Partially Rehabilitated

Business and Professions Code section 480, subdivision (b), provides in relevant part, that: "Notwithstanding any other provision of this code, no person shall be denied a license solely on the basis . . . that he or she has been convicted of a misdemeanor if he or she has met *all* applicable requirements of the criteria of rehabilitation developed by the board to evaluate the rehabilitation of a person when considering the denial of a license . . . ." (Italics added; see Bus. & Prof. Code, § 482 [requiring licensing boards to develop such criteria].)

The DRE has stated 14 criteria that it will use for the purpose of evaluating the rehabilitation of an applicant for a license who has committed a crime. (Cal. Code Regs., tit. 10, § 2911 (hereafter section 2911).) Donley submitted both documentary and testimonial evidence at the hearing addressing each of the criteria. The Commissioner's decision recognized Donley's evidence established he had satisfied most of them. However, the Commissioner concluded Donley was only partially rehabilitated. Donley claims on appeal that the administrative record conclusively shows he satisfied all of the criteria for rehabilitation.

We conclude substantial evidence supports the Commissioner's findings and implicit conclusion that Donley did not show the requisite "[c]hange in attitude from that which existed at the time of the conduct in question." (§ 2911, subd. (n).) Therefore, we do not address whether the Commissioner also correctly interpreted and determined that insufficient time had passed since the time of Donley's convictions. (§ 2911, subd. (a).) Donley has not shown he has met "all" the criteria necessary for a conclusion that he is rehabilitated. (Bus. & Prof. Code, § 480, subd. (b).)

Section 2911 provides, in relevant part, as follows: "The following criteria have been developed by the department pursuant to Section 482(a) of the

Business and Professions Code for the purpose of evaluating the rehabilitation of an applicant for issuance . . . of a license in considering whether or not to deny the issuance . . . on account of a crime or act committed by the applicant: [¶] . . . [¶] (n) Change in attitude from that which existed at the time of the conduct in question as evidenced by any or all of the following: [¶] (1) Testimony of applicant. [¶] (2) Evidence from family members, friends or other persons familiar with applicant's previous conduct and with his subsequent attitudes and behavioral patterns."

The Commissioner made the following relevant factual findings:

"17. There were considerable omissions and inconsistencies between what [Donley] told the police about the incident leading to his convictions, what he disclosed to the Department in his Confidential Report of Interview/ Conviction Details, and in his testimony. Counsel dismissed these as inconsequential and, in part, the product of counsel's completing the Conviction Details portion of the disclosure for [Donley]. The inconsistencies and omissions are not inconsequential. None of the omissions and inconsistencies was individually significant, but the overall impression is that [Donley] has not yet fully acknowledged the full nature and extent of his actions.

"18. There is a hearsay letter in evidence from Ms. Riddle in support of [Donley's] application. Ms. Riddle did not testify. . . . She commented in her letter that 'neither of us were at fault[.]' . . . That comment seriously harmed any credibility this letter may have had.

"20. [Donley] is partially rehabilitated. [Donley] has made every apparent effort to distance himself from the circumstances that resulted in the incident, and has made efforts to gain insight that will help prevent a recurrence. These efforts are worthy of recognition. However, the incident is relatively recent and he has just finished probation. As set forth above, there are significant indications in this record that [Donley] has not yet fully accepted the full import of his actions and the potential for harm his behavior risked."

The Commissioner concluded there was "not sufficient evidence of rehabilitation present in this record to warrant issuance of an unrestricted license."

In order for an applicant to be rehabilitated, section 2911, subdivision (n), calls for a "[c]hange in attitude from that which existed at the time of the conduct in question." Evidence of such change may be drawn from, as relevant here, the testimony of the applicant and evidence from family members, friends, or other persons familiar with the applicant's previous

conduct and his subsequent attitudes and behaviors. (§ 2911, subd. (n)(1), (2).) The Commissioner found omissions and inconsistencies between Donley's statement to officers at the time and his testimony before the ALJ, as well as what he disclosed in his confidential report of interview/conviction details (form 515D), that overall reflected Donley had not yet fully understood and accepted responsibility for his actions. Essentially, the Commissioner found there was not a sufficient "change of attitude."

To begin with, we consider the Commissioner's reliance on form 515D as part of the evidence regarding Donley's change of attitude. Donley objected to the use of the summary of his offense contained in form 515D at the administrative hearing on the basis that it did not qualify as a judicial admission because it was prepared by his counsel and not signed by him. Donley expands on this objection on appeal, claiming form 515D "was hearsay and lacked authenticity and foundation since it was prepared by counsel not Donley, was unsigned, and Donley was present to testify." (Capitalization changed.) However, while Donley discusses at some length in this section of his brief his related hearsay objection to the sheriff's department report, he does not provide any analysis or authorities supporting his claim with respect to form 515D. Such failure forfeits his contention. (*Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647 [199 Cal.Rptr. 72].)

In any event, the claim is meritless. Donley testified before the ALJ that he received and read form 515D as prepared by his counsel before he signed the related form 515. According to Donley, what his counsel put in the summary of the details of the crime portion of form 515D was accurate. Donley's testimony thus provided both the authentication and foundation for the admission of the form. Moreover, given Donley's testimony, the summary of his offense was admissible hearsay under the exception for adoptive admissions. (Evid. Code, § 1221.)

Nevertheless, there is a question whether the Commissioner erred in using form 515D in the portion of his decision regarding Donley's rehabilitation because section 2911, subdivision (n)(1) directs the Commissioner to consider the applicant's change of attitude as reflected by his "testimony." We need not explore whether form 515D qualifies as Donley's "testimony" because, even without consideration of form 515D, the inconsistencies between Donley's statement to the officers at the scene and his testimony before the ALJ support the Commissioner's conclusion that he had not really understood and accepted his fault in the offense, i.e., that he did not have an adequate change in attitude.

For example, in his statement to Ford, Donley described Riddle as all of a sudden yelling at him for taking the last beer. Donley told Ford that Riddle pushed him in the chest and scratched him with her nails. However, in his testimony before the ALJ, Donley described this same portion of their altercation as Riddle "freak[ing] out" because there was no beer left. Riddle not only pushed and scratched Donley, Donley added that she kicked him and shoved him into the cabinets causing him to hit his head. The difference suggests Donley is still adding details in order to (a) emphasize Riddle's role in their fight, (b) place more of the blame on Riddle for instigating it, and (c) justify his own reaction to her conduct.

As another example, in Donley's statement to Ford, Donley described himself as, during their upstairs fight, reaching down to take J. away from Riddle "because he was mad Riddle was involving their young child in the fight." In his testimony before the ALJ, Donley said J. tried to get in between them to break up their fight and Donley picked him up and moved him out of the way "before he got knocked down the stairs." Again, a reasonable inference is that Donley is trying to portray himself less as a person mad at Riddle and more as a person concerned for their son.

Donley submitted a letter of recommendation from Riddle into evidence at the administrative hearing. In the letter Riddle described the incident as "an argument that resulted in the involvement of law enforcement. Neither of us were [sic] to blame. It was a simple misunderstanding that escalated far beyond where it should have gone." The Commissioner reasonably found that the comment that " 'neither of us were [sic] at fault' " "seriously harmed any credibility this letter may have had." But Donley testified he agreed with Riddle's description of what happened. He repeated that although "neither of us were [sic] to blame," he takes responsibility for it. This choice of words—that neither of them was to blame, again suggests Donley is minimizing the event and his fault in it.[6]

We conclude substantial evidence supports the Commissioner's findings and conclusion that Donley has not met all the criteria for rehabilitation and is, therefore, only partially rehabilitated.

---

[6] Another inconsistency the Commissioner could have relied on involves the question of whether Donley choked Riddle. In his statement to Ford, Donley admitted he had his hand around Riddle's throat, but in his testimony before the ALJ, he denied the truth of that admission, claiming he never had a hold on her neck and never choked her. A reasonable understanding of this change in his description of events is that Donley was trying to minimize his conduct. However, since the Commissioner apparently did not rely on this; neither will we.

## CONCLUSION

The judgment is affirmed. Costs on appeal are awarded to respondent. (Cal. Rules of Court, rule 8.278(a)(1).)

Blease, Acting P. J., and Butz, J., concurred.