Filed 12/23/25  San Leandro Trailer Park v. City of San Leandro CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SAN LEANDRO TRAILER PARK, LLC, <br><br>     Petitioner and Appellant, <br><br> v. <br><br> CITY OF SAN LEANDRO, <br><br>     Respondent; <br><br> MARY BETTENCOURT et al., <br><br>     Real Parties in Interest and Respondents. | A170898 <br><br> (Alameda County <br>  Super. Ct. No. 23CV032090) |

**MEMORANDUM OPINION**

The owner of a mobile home park, San Leandro Trailer Park, LLC (the Park), petitioned for a writ of administrative mandamus to overturn a decision by a Hearing Officer of the City of San Leandro (the City) denying some aspects of its application for a rent increase under the City's mobile home rent control ordinance (the Ordinance).  The trial court entered a judgment denying the petition, and the Park now timely appeals.  We affirm.[1]

---

[1] We do not recite the factual and procedural background because our opinion is unpublished and the parties know, or should know, "the facts of the case and its procedural history."  (*People v. Garcia* (2002) 97 Cal.App.4th 847,

## DISCUSSION

We presume the parties' familiarity with the factual and procedural background of this case as well as the substantial evidence standard of review applicable to our review of the Hearing Officer's decision.

### 1.    Background:  The Ordinance

As summarized by the trial court, "the City enacted the Ordinance to 'establish an efficient method for reviewing certain requested Mobilehome Space Rent Increases in Mobilehome Parks to protect Mobilehome Owners from arbitrary, capricious or unreasonable Rent adjustments while enabling Park Owners and/or operators and investors to earn a fair and reasonable return on their investment in their Mobilehome Parks.' (Ordinance § 4-39-200.)  Except as provided in the ordinance, a mobile home park owner shall not demand rent exceeding the 'base rent,' or rent in effect for that space on July 1, 2018.  (*Id.*, § 4-39-210(A).)  The ordinance provides for annual rent increases and also gives a park owner the right to obtain a rent increase 'to maintain net operating income ('MNOI') equal to the Base Year net operating income adjusted by the percentage increase in the CPI since the Base Year.' (*Id.*, § 4-39-217(A).)  A park owner may apply [to] a rent review officer to 'rebut the presumption of fair and reasonable return based upon the Base Year net operating income.'  (*Id.*, § 4-39-220(B).)  Such an application has the 'burden of proof, by a preponderance of the evidence, on all issues.' (Ordinance § 4-39-225(N).)"

---

851 [unpublished opinion merely reviewing correctness of trial court's decision "does not merit extensive factual or legal statement"].)

2

## 2. Inflation Adjustment to Base Year Operating Expenses

The Park asserts, first, that the Hearing Officer's decision on its application for a rent increase is based on a legally erroneous calculation of its income for the base year under the Ordinance, in that the Park's base year operating expenses should have been, but were not, adjusted for inflation for the second half of 2018. In support, it proffered the expert opinion of certified public accountant Brian Eid. The Park's theory, reflected in Eid's analysis, is that because the Ordinance took effect mid-year in 2018 and locked in its rental *income* on July 1 of that year, it was entitled to reduce its *expenses* for the remainder of 2018 across-the-board by the amount of inflation in that period to offset the effects of inflation (i.e., from June 30 to December 31, 2018). That assumption was built into Eid's calculations.

The Park asserts this inflation adjustment is mandated under section 4-39-220(C)(3)(c) of the Ordinance which it quotes only in part. In full, that subsection states:

"Adjustments of Operating Expenses. Base Year and/or current operating expense items shall be averaged with other expense levels for the same types of items for other years or amortized *or adjusted by the CPI or may otherwise be adjusted, in order to establish an expense amount for the item(s) that most reasonably serves the objectives of obtaining a reasonable comparison of Base Year and prior year expenses.* Grounds for such adjustments include, but are not limited to:

"i. Either the amount or nature of an expense item for a particular year is not representative.

"ii. The Base Year expense is not a reasonable projection of average past expenditures for that item in the years immediately preceding or following the base year.

"iii. The prior year expense is not a reasonable projection of expenditures for that item in recent years or of future expenditures for that item.

"iv. If a particular item of expense exceeds the normal industry or other comparable standard for the area, the Park Owner shall bear the burden of proving the reasonableness of the expense. To the extent that it is found that the expense is unreasonable it may be adjusted to reflect the normal industry standard.

"v. A Base Year expense is exceptionally low by industry standards and/or on an inflation adjusted basis is exceptionally low relative to the prior year expense although the level or type of service for which the expense is incurred has not changed significantly.

"vi. An increase in maintenance or management expenses is disproportionate to the percentage increase in the CPI, while the level of services has not changed significantly and/or is not justified by special circumstances." (Italics added.)

The Park makes no attempt to explain how the foregoing language supports its position. It does not even quote the subsection in full. It does not specify which of the enumerated grounds supposedly supports the inflation adjustment it sought, but merely says the grounds "include[] an adjustment for inflation." It also discusses no law—nothing about the principles of statutory interpretation or the standard of review we apply to the City's interpretation of its own ordinance. (The answer is, we owe it deference (see *Symons Emergency Specialties v. City of Riverside* (2024) 99 Cal.App.5th 583, 600; *MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 219).) The City argues that an inflationary

4

adjustment is not mandatory under this section, and we ourselves see nothing in the language of this section suggesting that it is.

"Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review." (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078.) When an appellant fails to "convince us, by developing his arguments, stating the law, and calling out relevant portions of the record, that the trial court committed reversible error," the argument is insufficient to show error. (*Bishop v. The Bishop's School* (2022) 86 Cal.App.5th 893, 910.) That is true here.

In addition to the Park's failure to demonstrate a legal basis for the inflation adjustment that it sought there also is no factual basis, because there is a key flaw in Eid's analysis. As pointed out by the Park residents who have filed a brief, Eid assumed that the Ordinance took effect on *July 1, 2018*, and accordingly adjusted the operating expenses the Park incurred from July to December of that year by the amount of inflation in that period. But the Park acknowledged in its verified petition for administrative mandate that "[t]he Ordinance took effect on *July 3, 2019*"—that is, a year later. (Italics added.) So the entire premise of Eid's analysis was wrong. In its reply brief, the Park does not address this point. The City points to a second flaw in Eid's inflation adjustment analysis as well: the evidence showed that the Park would not have raised rents in the second half of 2018 anyway (i.e., to offset rising prices), because it typically only raised rents once a year and had already raised rents earlier in 2018. The Park says nothing about that either. We fail to see any "prejudicial abuse of discretion" (Code Civ. Proc., § 1094.5, subd. (b)) in declining to adopt Eid's (doubly) flawed calculation of base year expenses.

5

In its reply brief, the Park raises a new theory: it asserts that the Ordinance requires expense levels for the base year to be *averaged,* "whether it be by an inflation adjustment or not," and so *either* the inflation adjustment that it requested should have been used as "the appropriate adjustment to average base year operating expenses" or else "the Hearing Officer should have provided an average figure for the base year operating expenses to comply with this language in the Ordinance." We will not address this. " 'It is elementary that points raised for the first time in a reply brief are not considered by the court.' " (*Herrera v. Doctors Medical Center of Modesto, Inc.* (2021) 67 Cal.App.5th 538, 548.)

### 3. Management Expenses

The Park asserts that the hearing officer erroneously denied its request to make an adjustment to its operating expenses for a nearly $18,000 increase in fees it paid to the company that managed the Park, which is double what it had paid in management fees the prior year. The Park's principal witness, Matthew Davies, who is the operations manager for the outside management company, testified that the increase was due "in part" to increased expenses associated with complying with the new rent control ordinance and was general and conclusory.[2] We have reviewed the Park's arguments and find them unpersuasive.

---

[2] The Hearing Officer summarized Davies' testimony as follows: "Offsite management costs increased from 2018 to 2019 by $17,891. This increase occurred because in 2018 they thought they could manage the park for a lower fee of 3%. They realized they couldn't manage for this level of fee, in part because they were forced to deal with the new rent control ordinance. As a result, they were forced to raise their fee to a normal market rate of approximately 6% when they negotiated a new management agreement at the end of 2018. The fees are paid to his company. He is familiar with the fee levels based on his 20 years of experience. His company does not submit

6

The Hearing Officer interpreted the Ordinance as "requir[ing] proof of a significant change in the level of services or special circumstances to justify an increase in management fees that is disproportionate to the increase in the CPI."[3]  The Park does not address whether this interpretation of the Ordinance is correct, and so we presume that it is (or, put another way, the Park has forfeited any contention that it is wrong).  Applying that standard, the Hearing Officer found that the Park's management fees increased "drastic[ally]"—"by more than 100%" for the year in question but the Park had no "contemporary record of the services . . . performed" by its management company for that period, and "failed to submit *any* evidence to document or itemize the actual increased costs, such as increased staff time spent on Park services in general, or activity specifically in response to the enactment of the Ordinance."  (Italics added.)  It concluded that the Park "failed to meet its burden of proving that it incurred increased management fees as part of its operating expenses . . . due to a significant increase in documented management services or extraordinary circumstances."

---

invoices and does not have a specific breakdown of how the fees are allocated.  The industry standard for these fees is between 5% and 8%.  He doesn't know if his company's management agreement has been submitted as an exhibit in this case.  Most of his company's other contracts charge a fee of 7%."

[3]  The Ordinance states:  "It shall be presumed that management expenses increase by the percentage increase in Rents or the CPI, whichever is greater, between the Base Year and the prior year *unless the level of management services has either increased or decreased significantly* between the Base Year and the prior year."  (Italics added.)  It further states that operating expenses may be adjusted if "[a]n increase in maintenance or management expenses is disproportionate to the percentage increase in the CPI, while the level of services has not changed significantly and/or is not justified by special circumstances."

An administrative agency's findings "are presumed to be supported by the administrative record and, in both the trial court and here on appeal, it is petitioner/appellant's burden to show they are not." (*Donley v. Davi* (2009) 180 Cal.App.4th 447, 456.) The Park has not shown that. It argues only that it provided sufficient evidence that the *amount* of its *management expenses* increased, and that its increased management fee fell within industry norms. But it does not show that it met its burden to prove that the level of *management services* increased significantly. For example, it discusses no evidence specifying the kinds of additional work that was done that necessitated an increase in fees, much less the quantity of such additional work.

Instead, the Park addresses a straw man: it repeatedly says the Hearing Officer erred by faulting it for not producing documentary evidence to substantiate its request even though the Ordinance states no such requirement of documentary proof. The issue is not whether *the Ordinance* requires such proof. (Nor is it whether, as a factfinder, the Hearing Officer *could have* granted the request based on Davies' testimony alone.) Because the Park bore the burden of proof on all issues associated with its rent increase application (a principle nobody disputes (see Ordinance, § 4-39-225, subd. (N))), and we are now on appeal, the issue is whether the evidence that it introduced *required* the Hearing Officer as a matter of law to find that it was entitled to an adjustment for its increased management fees. The Park hasn't shown that. It does not explain why or how Davies testified with sufficient particularity to prove as a matter of law—with no room for a finder of fact to discount the weight or veracity of his testimony—that a significantly increased level of management services was provided. The Park cites no legal authority that the Hearing Officer was required to *believe*

8

Davies' uncorroborated, generalized testimony about the increased level of work the Park's outside management company undertook in the relevant period. " '[T]he testimony of a witness which has been rejected by the trier of fact cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved.' " (*In re Marriage of Grimes & Mou* (2020) 45 Cal.App.5th 406, 422.) The Park makes no attempt to show that Davies' testimony satisfies this exacting standard.

### 4. Vacancy Losses

We also reject the Park's argument that the Hearing Officer erroneously denied its request for a rent increase to account for vacancy losses it experienced.[4]

To seek a rent increase based on vacancy losses that exceed three percent of gross rent revenue, the Ordinance requires proof that such vacancies occurred to due factors beyond the Park's control. That is how the Hearing Officer interpreted the Ordinance, and all parties agree.[5] In denying the Park's request for a vacancy loss adjustment, the Hearing Officer

---

[4] The Park does not specify the extent of vacancy losses it suffered nor quantify how much of a rent increase it sought based on this factor, but according to the Hearing Officer's decision, the adjustment it sought was a "very significant" one, and "was listed as more than $102,000, or 23.6% of the Park's total gross income for 2019."

[5] In relevant part, section 4-39-220(C )(2)(a)(i) of the Ordinance states: "Gross Rents calculated as gross rental income at 100 percent occupancy, adjusted for uncollected Rents due to vacancy and bad debts to the extent such vacancies or bad debts are beyond the control of the Park Owner. Uncollected Space Rents in excess of three percent of gross Space Rent shall be presumed to be uncollectable unless established otherwise and shall not be included in computing gross rental income."

9

concluded there was a total failure of proof both as to the number and duration of vacancies *and* their causes. It explained, "The Park failed to provide detailed evidence to document the vacancy losses for either 2018 or 2019. The Park failed to document the number of vacancies during either period, the specific spaces that were vacant, the cause for each vacancy, the length of time each vacancy lasted, and the efforts made to find replacement residents." The Park makes no attempt to show that it *did* introduce evidence quantifying its vacancy losses in these ways. But without evidence quantifying the number and nature of the various vacancies for which the Park sought to be compensated, there was no basis to assess whether any of them were beyond the Park's control and, if so, whether the ones that were beyond its control collectively exceeded three percent of the Park's lost rent revenue. That alone suffices to affirm.

In addition, though, the Hearing Officer also found "[t]here is persuasive evidence that the Park Owner's actions caused these vacancies and that these actions also prolonged the losses incurred from at least some of the vacancies." It cited evidence such as the Park's "voluntary decisions" to increase rents and to upgrade the park by having a dealer install new model homes in vacant spaces and offer them for sale on the open market in the hope of attracting new park tenants, both of which decisions "thereby generat[ed] more short-term vacancy losses." It found that the vacancies were "partially" due to the Park's voluntary decision to increase rents by 20 percent after it bought the Park in 2017, which was a "voluntary decision within [its] control." It also found that "the decision to fill vacancies by upgrading with park models resulted in significant periods of time during which the space being upgraded was vacant. The decision to upgrade to park models was clearly a voluntary decision within the control of the Park.

10

Bayshore ignored other options, such as continuing to rent spaces to RV owners." It concluded, "These various management decisions affecting the vacancy rate are specifically found to be voluntary and not due to circumstances beyond the control of the Owner. As a result of these voluntary choices, the Park experienced a vacancy rate significantly greater than would otherwise have occurred." The Park makes no attempt to show that these findings are unsupported by substantial evidence. We will not second-guess them.[6]

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs.

---

[6] We also note they are fully supported by the testimony of the residents' expert, Kenneth Baar, whose testimony the Hearing Officer summarized, found to be credible and relied upon but the Park does not discuss. He opined that the vacancy losses were "astronomical" and "drastically too high" compared to industry norms (22.5 percent compared to less than three percent for all other parks), and noted a correlation between the Park's excessive vacancy rate and the rent increases and park upgrades it had voluntarily implemented.

STEWART, P. J.

We concur.

RICHMAN, J.

MILLER, J.

*San Leandro Trailer Park, LLC v. City of San Leandro* (A170898)