Filed 12/18/15

CERTIFIED FOR PARTIAL PUBLICATION[*]


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LEROY BURTON III,<br><br>    Defendant and Appellant. | E061187<br><br>(Super.Ct.No. RIF1304947)<br><br>OPINION |


APPEAL from the Superior Court of Riverside County. Christian F. Thierbach, Judge. Affirmed.

David L. Annicchiarico, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Sean M. Rodriquez, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts 1, 2, and 3 of the Legal Analysis.

1

Defendant and appellant Leroy Burton III appeals his conviction on one count of first degree murder. In the unpublished portion of this opinion, we reject Burton's contentions that the evidence was insufficient to show that he deliberated and premeditated the killing, that the court erred in its instruction on premeditation and deliberation, and that trial counsel provided constitutionally deficient representation. In the published portion of the opinion, we reject the contention, based on *Morales-Garcia v. Holder* (9th Cir. 2009) 567 F.3d 1058 (*Morales-Garcia*), that intimate partner battery, in violation of Penal Code section 273.5, is not categorically a crime of moral turpitude. We conclude that Burton's two prior convictions for violation of that statute were properly admitted for impeachment purposes.

PROCEDURAL HISTORY

Defendant was charged with the first degree murder of Ja'bari Jones and the personal use of a firearm causing death. (Pen. Code, §§ 187, subd. (a), 12022.53, subd. (d).)[1] The information also alleged that defendant had one prior strike conviction and had served three prior felony prison terms. (§§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1), 667.5, subd. (b).)

A jury convicted defendant of first degree murder and found the gun use allegation true. Defendant admitted the prior conviction and prior prison term allegations, and the trial court accepted the admissions. The court sentenced defendant to three consecutive determinate terms of one year for the prior prison term enhancements and to a term of 50

---

[1] All further statutory citations refer to the Penal Code.

2

years to life for the murder and a consecutive term of 25 years to life for the firearm enhancement.

Defendant filed a timely notice of appeal.

FACTS

At approximately 1:00 p.m. on May 31, 2013, a resident of the Pepper Tree apartment complex in Riverside discovered Ja'bari Jones lying in the complex parking lot. Jones was lying near his parked car and was unconscious and bleeding. Paramedics performed chest compressions and CPR, but Jones did not regain consciousness. He was pronounced dead at the hospital. Jones had suffered two small-caliber gunshot wounds: a potentially nonfatal wound to his head and an inevitably fatal one to his chest. The gunshot to his chest entered through his left armpit and went through his heart. A live .22-caliber round and one expended .22-caliber shell casing were found near his body. No gun was found.

A resident of the complex saw defendant running through an alleyway in the complex between 12:30 and 1:30 p.m. on the same date. Defendant had a lanyard with keys around his neck and was clutching the waistband of his pants as though to hold them up. The witness did not see a gun and had not heard any gunshots. He had seen defendant in the complex four or five times before.

That same day, defendant phoned Brenika Thompson, who was the mother of his child, and asked her to come pick him up. He told her he had just shot at someone or had shot someone. Thompson refused to pick him up. She then called 911. An investigator came to her home and had her make a recorded call to defendant. During that

3

conversation, defendant told Thompson that he had shot someone twice. He was very angry that the person had come to his home, where his family lived, to try to collect money the person claimed defendant owed him. Defendant said he had paid the debt and had paid an amount in excess of what he owed.

Defendant called his cousin to pick him up at an apartment complex where he had previously lived. When the cousin arrived, he could not find defendant. He went to a nearby gas station and went into the store. When he came out, defendant was standing in the gas station parking lot. Defendant got into the backseat of the car and lay down. The police were by then looking for defendant, and an officer saw defendant hop over a wall to enter the gas station parking lot. Police stopped the vehicle shortly thereafter and arrested defendant.

Damien Andrews, a friend of both defendant and Jones, told a detective that defendant had asked him to take him to a check cashing store so he could cash his tax refund check.[2] Defendant said he wanted to repay Jones some money he owed him. Defendant was unable to cash the check, however, because the clerk at the store believed the check had been altered.

During his interview with a police detective, defendant denied knowing Jones. He also denied owing anyone money and denied shooting Jones. He denied any knowledge of the incident that culminated in Jones's death.

---

[2] At trial, Andrews claimed not to remember talking to the detective and claimed not to remember anything concerning defendant's debt to Jones or attempting to assist defendant in cashing the check.

4

At the trial, defendant admitted that he had lied to the detective. He said he did so because he does not trust the police, because he saw police shoot and kill his father when he was 14 years old. He testified that he owed Jones $100 from a marijuana transaction.[3] He had previously tried to repay Jones using a tax refund check, but he was not able to cash the check. On May 31, 2013, Jones came to the apartment where defendant lived with his aunt, two cousins and the young daughter of one of his cousins, and demanded the money Jones said defendant owed him. Jones had not let defendant know that he intended to come over that morning. When defendant said that he did not have the money, Jones pulled a gun from his waistband and ordered defendant to come with him. Jones took defendant at gunpoint to the parking lot of the apartment complex. When they got to Jones's car, Jones attempted to open the door of the car with his left hand. When defendant saw that Jones was distracted, he grabbed Jones's right wrist and kneed him, causing Jones to drop the gun. Defendant was scared.[4] He stepped back and then fired two shots at Jones without looking at him or aiming, and then ran away. He threw the gun into a dumpster in the apartment complex. He did not know whether he had shot Jones.

---

[3] Defendant also testified that he had already repaid Jones, but that on the day he tried to cash the tax refund check, he agreed to pay Jones $100 to placate him.

[4] On cross-examination, defendant admitted that Jones was incapacitated at that point and that he was not reaching for another gun. He also testified that he was seven feet away from Jones when he fired.

LEGAL ANALYSIS

1.

SUFFICIENCY OF THE EVIDENCE

Murder is presumed to be of the second degree. (*People v. Anderson* (1968) 70 Cal.2d 15, 25 (*Anderson*).) An unlawful killing with malice aforethought becomes first degree murder if it is "willful, deliberate and premeditated." (§ 189; see § 187, subd. (a).)[5] In order for a killing with malice aforethought to be first rather than second degree murder, the intent to kill must be formed upon a preexisting reflection and must have been the subject of actual deliberation or forethought. (*Anderson*, at p. 26.) Although "'[t]houghts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly'" (*People v. Solomon* (2010) 49 Cal.4th 792, 813), i.e., first degree murder nevertheless requires evidence that the defendant "thought about or considered the act beforehand" (*People v. Pearson* (2013) 56 Cal.4th 393, 443). Therefore, a verdict of murder in the first degree on a theory of willful, deliberate, and premeditated killing is proper only if the perpetrator killed "'"as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan; carried on cooly [*sic*] and steadily, [especially] according to a *preconceived design*." [Citation.]'" (*Anderson*, at p. 26.) In contrast, an intentional killing which is not deliberate or premeditated committed in the heat of passion can constitute second degree murder: Provocation or heat of passion which is not objectively reasonable and therefore cannot

---

**5** Section 189 describes other types of murder which qualify as first degree murder. Here, we are concerned solely with willful, deliberate and premeditated murder.

6

support a verdict of voluntary manslaughter can negate premeditation and deliberation and thus support a verdict of second degree murder. (*People v. Rogers* (2006) 39 Cal.4th 826, 877-878.)

Defendant contends that there is no substantial evidence that supports the conclusion that he premeditated and deliberated before shooting Jones. Instead, he contends, the evidence shows that he killed Jones impulsively, in an explosion of rage, because he was affronted that Jones came to his home to demand repayment of a debt. "Our task in deciding a challenge to the sufficiency of the evidence is a well-established one. '[W]e review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] In cases in which the People rely primarily on circumstantial evidence, the standard of review is the same. [Citations.]' [Citation.] '"An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise. [Citations.]"'" (*People v. Solomon*, *supra*, 49 Cal.4th at pp. 811-812.) Reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

7

Evidence of a defendant's state of mind may be either direct or circumstantial. (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.) Here, there was direct evidence bearing on defendant's state of mind, i.e., his testimony that he was afraid when Jones took him at gunpoint to the parking lot and his statements to Thompson that he was angry that Jones had come to his home to demand repayment. Neither his testimony nor his statements to Thompson bears directly on the issue of premeditation and deliberation, however. Accordingly, as is most commonly the case, the question presented on appeal is whether there is substantial circumstantial evidence of premeditation and deliberation. (*Ibid*.)

Defendant relies on *Anderson*, *supra*, 70 Cal.2d 15, to argue that there is insufficient evidence to support a finding that he premeditated and deliberated killing Jones. In *Anderson*, the California Supreme Court identified three factors that are commonly present in cases of premeditated murder and which, if present in some combination, may support the inference that the defendant premeditated and deliberated before killing: "(1) [F]acts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the

8

*manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Id.* at pp. 26-27.)

The court has repeatedly cautioned that "'[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way.' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081.) In other words, "'[t]he *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive.' [Citation.]" (*Ibid.*) Nevertheless, *Anderson* provides a useful framework in this case.

We begin with the evidence of planning activity. Defendant contends that, even taking into account that a premeditated and deliberate plan can be arrived at in a short time (*People v. Solomon*, *supra*, 49 Cal.4th at p. 813), there simply is no evidence that he planned to kill Jones. The Attorney General responds that the evidence showed that defendant "decided to kill Jones because [defendant] owed him money, but [defendant] was upset and did not want to pay him," that when defendant's attempt to cash the tax refund check failed, defendant "resolved to kill Jones instead," and that when Jones "showed up at [defendant's] house asking for money, [defendant] decided that instead of

9

paying Jones, he would murder him." She does not, however, cite any evidence that defendant "resolved" to kill Jones when he was unable to cash the check or that defendant "decided" to kill Jones either before Jones had arrived at defendant's home or upon Jones's arrival at his home, and in fact there is none. The inference that defendant decided in advance to kill Jones would be supportable if there were any evidence that defendant was expecting Jones or that he was armed with a gun when Jones arrived, but there is no such evidence.[6] The sole evidence as to how the incident began is defendant's testimony and his telephone conversation with Thompson, in both of which defendant said that Jones came to his apartment unexpectedly and demanded the money defendant owed him. There is no evidence that defendant had armed himself in anticipation of Jones's arrival or that he had any idea that Jones would be coming to his apartment that day or any other day to demand repayment.

Nor is there any evidence that supports the Attorney General's argument that defendant took Jones to the parking lot to kill him rather than shooting him on his own doorstep because the parking lot was an isolated place where there would be no witnesses. The incident *might* have happened that way, but that possibility is not sufficient to support the inference that it *did* happen that way. (*People v. Moore* (2011) 51 Cal.4th 386, 406 ["That an event *could* have happened, however, does not by itself

---

[6] The prosecutor argued that "we know" defendant and not Jones had the gun because defendant did not tell Thompson that Jones pulled a gun on him or that he took the gun away from Jones. Rather, defendant told Thompson merely that he shot someone. Defendant's failure to explain to Thompson in detail how the shooting occurred, however, is not evidence that supports the inference that defendant rather than Jones had a gun.

10

support a deduction or inference [that] it did happen"].)  Again, the sole evidence as to how defendant and Jones came to be in the parking lot is defendant's own description of the event.

Nor does the jury's disbelief of defendant's claim of self-defense or imperfect self-defense warrant the inference that if the incident did not occur as defendant claimed it did, it must have happened as the prosecution claimed.  "The prosecution bears the burden to prove each element of the crimes charged.  [Citation.]  That burden is not met through mere disbelief of defendant's denial that he committed the crimes.  'A reasonable inference "'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.'"  [Citation.]  It must logically flow from other facts established in the action.'  [Citations.]  Disbelief of defendant's testimony, without more, does not constitute 'other facts' from which logically flows the conclusion, beyond a reasonable doubt, that defendant did that which he denied doing."  (*People v. Velazquez* (2011) 201 Cal.App.4th 219, 231; accord, *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1266-1267 [Fourth Dist., Div. Two].)

Nevertheless, the evidence does reasonably support the inference that defendant premeditated and deliberated killing Jones.  Premeditation and deliberation may be inferred if the defendant had a motive to kill the victim and if the manner in which the killing was committed suggests that the killing was planned in advance.  (*Anderson*, *supra*, 70 Cal.2d at pp. 26-27.)  Here, although defendant's debt to Jones might reasonably be deemed to be sufficient evidence of motive—certainly, murders have been committed over small debts—the evidence more strongly supports the conclusion that

11

defendant killed Jones because he was angry that Jones came to defendant's home to demand repayment. The evidence does not, however, support defendant's contention that the killing occurred in an explosion of rage. To support a verdict of second degree murder on this theory, there must be evidence of provocation which "would justify a jury determination that the accused had formed the intent to kill as a direct response to the provocation *and had acted immediately*." (*People v. Wickersham* (1982) 32 Cal.3d 307, 329, overruled on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 200-201.) If Jones had been shot at the apartment door, this would be a reasonable inference. However, the indisputable fact that Jones was shot in the parking lot reasonably supports the inference that although defendant may indeed have been angry, he did not act on his anger impulsively or explosively. Rather, defendant accompanied Jones to the parking lot, either under duress or otherwise, and then shot and killed Jones. His anger may have been growing as he walked from the apartment to the parking lot, but a killing motivated by anger may nevertheless be deliberated and premeditated rather than rash and impulsive. (*People v. Arcega* (1982) 32 Cal.3d 504, 519; *People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102-103.)

The manner in which defendant killed Jones also reasonably supports the inference that he did so with premeditation and deliberation. The evidence supports the inference that defendant racked the semiautomatic pistol and then fired two shots, one of which hit Jones in the head and one of which hit him in the chest. This is not consistent with defendant's testimony that he seized the gun and fired blindly while retreating. Although it is possible that defendant fired two well-placed shots by sheer accident, it is

12

also reasonable to infer that he aimed carefully with a preconceived intention of killing Jones. This scenario is consistent with defendant having determined, at some prior point in the encounter, that he would seize Jones's gun when the opportunity presented itself and that he would kill Jones. Alternatively, it is consistent with defendant having seized the gun opportunistically without having reached a prior decision to kill Jones but having arrived, quickly, at the premeditated and deliberate decision to kill Jones to avenge the disrespect he felt Jones had displayed by coming to his home uninvited to demand repayment of the debt.

Other interpretations of the evidence are of course possible. Nevertheless, because we cannot say that the evidence is not sufficient to support the conviction under any hypothesis whatsoever (*People v. Bolin*, *supra*, 18 Cal.4th at p. 331), we must affirm the conviction.

2.

INSTRUCTIONAL ERROR

The trial court instructed the jury on first degree murder using a modified version of CALCRIM No. 521:

"The defendant is guilty of first-degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice, and knowing the consequences decided to kill. The defendant acted with premeditation if he decided to kill before completing the acts that caused death.

13

". . . The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances.

"A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

"The People have the burden of proving beyond a reasonable doubt that the defendant is guilty of first-degree murder rather than a lesser crime. For purposes of this case, the difference between first- and second-degree murder is the requirement that the People prove the existence of the elements of deliberation and premeditation for first-degree murder. If either of those elements . . . has not been proved, the defendant is not guilty of first-degree murder."

Defendant singles out one sentence to argue that the instruction fails to properly convey the concept of premeditation: "The defendant acted with premeditation if he decided to kill before completing the acts that caused death." Defendant contends that this sentence renders the entire instruction misleading because "jurors could have understood this definition to mean that, for premeditation, [defendant] only needed to have decided to kill Jones before shooting him," rather than acting out of a preconceived design. He contends that the remainder of the instruction did not rectify the inaccuracy.

14

The selected sentence apparently intends to convey that the decision to kill must precede the act, to distinguish premeditation from the concept, as explained in CALCRIM No. 251, i.e., that there must be a "union, or joint operation, of act and wrongful intent." We agree that it does not provide an ideal explanation of that distinction. However, we must determine whether an instruction is erroneous or misleading when read in the context of the instructions as a whole, not from consideration of part of an instruction. (*People v. Smithey* (1999) 20 Cal.4th 936, 963-964.) As we have discussed in the preceding section, a deliberate and premeditated murder is one that "result[s] from preexisting reflection and weighing of considerations" (*People v. Koontz, supra*, 27 Cal.4th at p. 1081), or an intentional killing according to a ""'preconceived design'"" (*Anderson, supra*, 70 Cal.2d at p. 26). Here, the instruction, read as a whole, clearly conveys that concept. It states that a murder is deliberate and premeditated only if the defendant "carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill," and that a "decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." Accordingly, defendant has not demonstrated that there is a reasonable likelihood that the jury misunderstood and misapplied the instruction in a manner which violated his constitutional rights. (*People v. Smithey*, at p. 963, citing *Estelle v. McGuire* (1991) 502 U.S. 62, 72 & fn. 4.)

15

3.

INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that his trial attorney rendered constitutionally inadequate assistance because she failed to argue second degree murder as an alternative to self-defense. He contends that she "put all her eggs in [the] flimsy basket of self-defense," and that no reasonably competent attorney would have done so but would instead have offered second degree murder as a fallback position.

To prevail on a claim of ineffective assistance of counsel, a defendant must establish that his attorney's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 686–687 (*Strickland*).) There is a presumption that the challenged action "'might be considered sound trial strategy'" under the circumstances. (*Id.* at pp. 689, 694.) On a direct appeal, a conviction will be reversed for ineffective assistance of counsel only when the record demonstrates there could have been no rational tactical purpose for counsel's challenged act or omission. (*People v. Lucas* (1995) 12 Cal.4th 415, 442 ["Reviewing courts reverse convictions on direct appeal on the ground of incompetence of counsel only if the record on appeal demonstrates there could be no rational tactical purpose for counsel's omissions"]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1058 ["'If the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide

16

one, or unless there simply could be no satisfactory explanation," [citation], the contention [that counsel provided ineffective assistance] must be rejected'"].)

Here, defendant criticizes his attorney for failing to argue to the jury that he was guilty of second degree murder in that he killed Jones in the heat of passion when Jones came to his house without warning to demand money. As noted above, provocation or heat of passion which is not objectively reasonable and therefore cannot support a verdict of voluntary manslaughter can nevertheless negate premeditation and deliberation and thus support a verdict of second degree murder. (*People v. Rogers*, *supra*, 39 Cal.4th at pp. 877-878.) To support a verdict of second degree murder on this theory, however, there must be evidence of provocation which "would justify a jury determination that the accused had formed the intent to kill as a direct response to the provocation *and had acted immediately*." (*People v. Wickersham*, *supra*, 32 Cal.3d at p. 329, italics added.) Because at least several minutes elapsed between Jones's arrival at the apartment and the shooting in the parking lot, the evidence does not support this theory. Rather, as we have discussed above, even if defendant was enraged by Jones's unannounced and unexpected arrival at defendant's apartment, the fact that he did not kill Jones immediately negates the inference that he did so in the heat of passion. It cannot be said to be an unreasonable tactical decision to decline to argue a defense that is not supported by the evidence. Moreover, failing to do so cannot possibly operate to the defendant's prejudice, in that there is no reasonable probability that a jury will return a verdict which is not supported

by the evidence.[7]  (*Strickland*, *supra*, 466 U.S. at p. 695 ["assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision"].)  Accordingly, counsel's failure to argue this theory does not amount to ineffective assistance.

Moreover, defendant's contention that his attorney erred by relying exclusively on self-defense is unfounded.  Counsel also argued to the jury that if it did not believe that a reasonable person in defendant's position would have believed in the need for self-defense, it could convict him of voluntary manslaughter under the theory of imperfect self-defense.  Consequently, defendant's argument that his attorney was ineffective for failing to offer the jury a fallback option also fails.

4.

VIOLATION OF SECTION 273.5 IS A CRIME OF MORAL TURPITUDE

Defendant contends that the court erred in admitting his two prior convictions for violation of section 273.5, willful infliction of corporal injury on an intimate partner, because such crimes are not crimes of moral turpitude and therefore could not be used to

---

[7] Defendant relies on *In re Walker* (2007) 147 Cal.App.4th 533 to argue that a defense attorney has an obligation to argue alternate theories, even if doing so would contradict the defendant's testimony.  *Walker* does not involve a claim of ineffective assistance of counsel.  Rather, the habeas corpus petition in that case was brought under section 1473.5, which allows certain individuals convicted of murdering abusive intimate partners to request a new trial if they can demonstrate that there is evidence of "'intimate partner battering and its effects'" (*Walker*, at p. 536, fn. 1) which was not admitted at their trial and which might have resulted in acquittal or conviction of a lesser offense if it had been admitted.  (*Id*. at p. 545-554.)  *Walker* implies that under some circumstances, perhaps, trial counsel should argue alternate legal theories, even if they contradict the defendant's testimony.  (*Id*. at pp. 553-554.)  However, it neither holds nor implies that a defense attorney should argue theories which are not supported by the evidence.

18

impeach him. In the alternative, he contends that his attorney provided constitutionally deficient representation by failing to object to the use of those prior convictions on that ground.

Any testifying witness can be impeached with evidence that he or she suffered a prior conviction of a felony involving moral turpitude. (*People v. Castro* (1985) 38 Cal.3d 301, 306.) One definition of moral turpitude is a "'general readiness to do evil.'" (*Id.* at pp. 314-315.) Whether a crime is one of moral turpitude is determined not by the facts underlying a particular commission of the offense but from the statutory elements test. (*Id.* at pp. 316-317.) If the crime can be committed in a way that does not amount to moral turpitude, it cannot be used for impeachment. (*Ibid.*)

Defendant suffered convictions in 2001 and 2005 for violating section 273.5. The version of that statute in effect on those dates provided in pertinent part: "(a) Any person who willfully inflicts upon a person who is his or her spouse, former spouse, cohabitant, former cohabitant, or the mother or father of his or her child, corporal injury resulting in a traumatic condition, is guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not more than one year, or by a fine of up to six thousand dollars ($6,000) or by both that fine and imprisonment. [¶] . . . [¶] (c) As used in this section, 'traumatic condition' means a condition of the body, such as a wound or external or internal injury, whether of a minor or serious nature, caused by a physical force." (Former § 273.5, subds. (a), (c); Stats. 2003, ch. 262, § 1.)

California courts have held that section 273.5 is a crime of moral turpitude because the statute protects individuals who are in special relationships "for which society rationally demands, and the victim may reasonably expect, stability and safety, and in which the victim, for these reasons among others, may be especially vulnerable. To have joined in, and thus necessarily to be aware of, that special relationship, and then to violate it wilfully and with intent to injure,[8] necessarily connotes the general readiness to do evil that has been held to define moral turpitude." (*People v. Rodriguez* (1992) 5 Cal.App.4th 1398, 1402; accord, *People v. Martinez* (2002) 103 Cal.App.4th 1071, 1080-1081 [evidence of witness's pending spousal abuse charges was admissible for impeachment]; *Donley v. Davi* (2009) 180 Cal.App.4th 447, 461 [§ 273.5 is a crime of moral turpitude as a matter of law].)

---

**8** The full quote from *Rodriguez* is as follows: "To violate Penal Code section 273.5 the assailant must, at the very least, have set out, successfully, to injure a person of the opposite sex in a special relationship for which society rationally demands, and the victim may reasonably expect, stability and safety, and in which the victim, for these reasons among others, may be especially vulnerable. To have joined in, and thus necessarily to be aware of, that special relationship, and then to violate it wilfully and with intent to injure, necessarily connotes the general readiness to do evil that has been held to define moral turpitude." (*People v. Rodriguez*, *supra*, 5 Cal.App.4th at p. 1402.) *Rodriguez* is mistaken that the statute requires the specific intent to injure. Rather, it requires a "willful" act which results in injury and is thus a general intent crime. (*People v. Thurston* (1999) 71 Cal.App.4th 1050, 1053 [Fourth Dist., Div. Two] [in the absence of further language denoting a requirement of specific intent, "willfully" denotes general intent].) And, as we discuss below, it no longer applies only to protect from injury a person of the opposite sex. These facts do not affect our conclusion that *Rodriguez* correctly concluded that a violation of section 273.5 is a crime of moral turpitude.

Relying on *Morales-Garcia*, *supra*, 567 F.3d 1058, defendant contends, however, that former section 273.5 is not a crime of moral turpitude because, unlike the other categories of victims named in the statute, cohabitants are not necessarily in a "special relationship of trust such as to make an assault by one on the other" a crime of moral turpitude, and former cohabitants certainly are not in such a relationship. (*Morales-Garcia*, at pp. 1064-1066.) Accordingly, he contends, the statute can be violated in a manner that does not constitute moral turpitude. We disagree with this interpretation.

We review issues of statutory interpretation independently. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311.) In matters of statutory interpretation, a court's task is to determine and effectuate the intent of the Legislature. (*People v. Cruz* (1996) 13 Cal.4th 764, 782.) The Legislature has long recognized that violence between people in intimate relationships is common. It enacted former section 273d and section 273.5 to afford greater protection to intimate partners than is afforded by the battery statutes to people in general. (*People v. Gutierrez* (1985) 171 Cal.App.3d 944, 948-949.) The statute initially applied only to domestic violence inflicted by husbands upon their wives or inflicted by anyone upon a child. (Former § 273d; see *Gutierrez*, at p. 948, fn. 2.) In response to the recognition that there had been a substantial increase in unmarried couples living together, in 1977 the Legislature amended section 273.5 to include spouses

21

of both sexes in its protections, as well as cohabiting members of the opposite sex.[9] (*Gutierrez*, at pp. 948-949.) In light of the fact that the purpose of section 273.5 is to protect individuals from domestic violence in intimate relationships, it cannot rationally be argued that for purposes of that statute, "cohabitant" can be understood to encompass casual relationships. For this reason, California courts recognize that for purposes of section 273.5, "cohabitant" refers to those """living together in a substantial relationship—one manifested, minimally, by permanence and sexual or amorous intimacy."' [Citations.] 'The element of "permanence" in the definition refers only to the underlying "substantial relationship," not to the actual living arrangement.' [Citation.]" (*People v. Taylor* (2004) 118 Cal.App.4th 11, 18-19; accord, *People v. Belton* (2008) 168 Cal.App.4th 432, 438 ["'cohabitant'" refers to "'something more than a platonic, rooming-house arrangement'"].) This understanding is further supported by the most recent amendment to section 273.5. The current version of the statute extends section 273.5 to "[t]he offender's fiancé or fiancée, or someone with whom the offender has, or previously had, an engagement or dating relationship, as defined in paragraph (10) of subdivision (f) of Section 243." (§ 273.5, subd. (b)(3).) Section 243 defines "'[d]ating relationship'" as "frequent, intimate associations primarily characterized by the expectation of affectional or sexual involvement independent of financial considerations," i.e., not a casual social relationship but an intimate one. (§ 243, subd. (f)(10).)

---

[9] A 1994 amendment removed "opposite sex" as a limitation on cohabiting couples. (Stats. 1993-1994, 1st. Ex. Sess., ch. 28, § 2.)

In 1999, the Legislature amended section 273.5 to include former spouses and former cohabitants (Stats. 1999, ch. 660, § 2), and in 2013 to include current and former dating partners and currently and formerly engaged couples (Stats. 2013, ch. 763, § 1). The latter two amendments reflect the Legislature's understanding that domestic violence occurs in both cohabiting and noncohabiting intimate relationships (Assem. Com. on Public Safety, Rep. on Assem. Bill No. 16 (2013-2014 Reg. Sess.), Mar. 11, 2013, pp. 4-6) and that "domestic violence which occurs after the victim has left the abuser . . . accounts for 75% of reported assaults by an intimate partner" (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 563 (1999-2000 Reg. Sess.), as amended Aug. 23, 1999, p. 6). Accordingly, the court in *Morales-Garcia*, *supra*, 567 F.3d 1058, is simply mistaken in holding that section 273.5 applies to casual cohabitants as well as to intimate cohabitants. It is also mistaken in its apparent belief that the California Legislature does not consider former intimate cohabitants to be in a relationship which by its nature is deserving of special protection.

The language employed in *People v. Rodriquez*, *supra*, 5 Cal.App.4th 1398 is obviously partially obsolete, in that section 273.5 no longer protects only persons of the opposite sex, and, as we pointed out above, *Rodriguez* is mistaken in saying that section 273.5 requires the specific intent to inflict injury. Nevertheless, the court correctly understood the basis for concluding that a violation of section 273.5 is a crime of moral turpitude: "[S]ociety rationally demands, and [individuals] may reasonably expect, stability and safety" in the types of relationships specified in section 273.5. (*Rodriguez*, at p. 1402.) Accordingly, we agree with the California courts that have

23

previously addressed this issue that violation of section 273.5 is a crime of moral turpitude as a matter of law.  (*Rodriguez*, at p. 1402; *People v. Martinez*, *supra*, 103 Cal.App.4th at pp. 1080-1081; *Donley v. Davi*, *supra*, 180 Cal.App.4th at p. 461.)

Because defendant's prior convictions for violating section 273.5 involve crimes of moral turpitude, defense counsel's failure to object to their admission for impeachment purposes did not constitute inadequate representation:  An attorney has no duty to make motions or objections that would be futile.  (*People v. Price* (1991) 1 Cal.4th 324, 387.)

DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

McKINSTER_____

J.

We concur:


RAMIREZ_____
              P. J.


HOLLENHORST_____
              J.