[No. F010030. Fifth Dist. Apr. 14, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
DALE ALLEN LINDSAY, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part II.

COUNSEL

Jay E. Goodman, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, and Wanda Hill Rouzan, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

BROWN (G. A.), J.*—Though defendant was charged in count one with robbery (Pen. Code, § 211),[1] and count two with violating Vehicle Code section 10851 (auto theft), the jury returned a verdict of guilty of misdemeanor battery (§ 242) on count one and could not arrive at a verdict on count two, resulting in a mistrial as to count two.

One of several prior felonies used to impeach defendant was a conviction of a battery upon a police officer (§ 243, subd. (c)), which occurred in 1986.

Later, pursuant to a plea bargain, defendant pled guilty to violating Vehicle Code section 10851 (auto theft), a motion to strike all prior convic-

---

\* Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

[1] All statutory references are to the Penal Code unless otherwise indicated.

tions was granted, and the prosecution agreed not to seek consecutive terms. Defendant was sentenced to three years on count two and to one hundred-eighty days in the county jail on count one, the sentences to be served concurrently. He appeals.

### FACTS

Jerry Harness, the victim, testified that at approximately 4 p.m. on September 4, 1987, defendant came into the Maverick Bar in Modesto. He sat next to Harness, and eventually asked him to give him a ride to defendant's motel room where he had medication. The victim declined.

Harness was in the Modesto area to handle a child custody matter, and had made a bank withdrawal of $200 just prior to going to the bar. He hoped to reach his attorney from the bar telephone. He had been at the bar several hours before defendant arrived. Approximately one-half hour after defendant entered the bar, Harness reached his attorney. After the two spoke, Harness became upset and began drinking because his attorney told him he could not help him in the custody matter.

Defendant and Harness were formally introduced by Gary Venturino around 6 p.m. Venturino knew both men. After the men drank several beers together, defendant renewed his request for a ride and Harness agreed.

They first drove to defendant's motel room. Harness waited in the car while defendant went inside. He returned sometime later with a brown paper bag which he asked Harness to put in the trunk of the vehicle. Harness complied.

The two resumed driving and went to another bar. After about 45 minutes at the bar, defendant again asked Harness to drive him home. Apparently defendant was looking for friends at the bar, but could not find them.

According to Harness, before reaching defendant's motel for a second time, Harness stopped the vehicle at defendant's request so defendant could go to the bathroom. Defendant exited the vehicle. Suddenly, the door of the driver's side of the vehicle was opened. Defendant was there and began striking Harness. One blow hit him in the eye. Eventually Harness fell across the front seat, losing consciousness.

Harness testified that when he regained consciousness, he found defendant on top of him. Defendant had Harness's wallet in his hands and was taking money from it. He threw the empty wallet on the dash and struck Harness in the mouth.

Harness had a pocket knife in the console between the front bucket seats. Defendant grabbed it as he held Harness down by pressing his forearm against Harness's throat. Harness asked what was going on, and defendant responded by holding the knife against Harness's eye, and eventually cutting his lip. He held him down for about 10 minutes, in which time he told Harness he ought to kill him.

Harness said that when defendant finally let him sit up, defendant ordered him into the front passenger seat. Defendant then drove the car himself. He went through several intersections that had flashing red lights, but did not stop. Harness was frightened. He asked defendant to stop so he could drink coffee. Defendant refused, stating that he knew what he was going to do with Harness.

At about 2 a.m., defendant finally stopped at an intersection because a police car was parked across the street. As defendant came to a stop, Harness jumped from the vehicle and flagged down the patrol car. Defendant fled in the Harness vehicle. After Harness told the officer what had happened, the officer attempted to pursue defendant. However, he was unable to find him or the vehicle.

The officer observed blood on Harness's mouth and eye. Harness also had broken teeth and was very upset. The officer further observed that Harness smelled of alcohol, but did not appear to be under the influence.

A few days later, the vehicle was found about three miles from where Harness jumped out. Harness retrieved the vehicle from the police impound lot. He recalled defendant placing the bag in the trunk. When he looked, the bag was still there. Inside the bag were papers, prescription medicine, and other miscellaneous items. Defendant's name was found among the items in the bag.

When Harness was interviewed on September 11, the interviewing officer noted Harness's face was still puffy and swollen, his eye was black and purple, and he had been cut with a small knife.

Defendant was subsequently arrested. According to defendant, he entered the Maverick Bar about 1 p.m., but did not drink because of his diabetic condition. He was in the bar looking for his friends.

Defendant testified Harness entered the bar at about 4:30 p.m. and ordered a beer. He sat next to defendant. Harness told defendant that Harness's ex-wife had charged him with sexually abusing his children. Harness asked if defendant knew an attorney. After initial reluctance, defendant

agreed to go with Harness to San Francisco, to talk with Harness's ex-wife. Defendant needed clothes for the trip, so Harness drove to defendant's motel. They went inside and defendant filled a bag with underwear, medications, and soda drinks.

Defendant continued, stating the men went to several bars where Harness drank and danced. Defendant felt it was too late to start for San Francisco, and told Harness they should find a place to park their car and rest. When they stopped, Harness made a sexual advance. Defendant struck him in the eye and attempted to leave. Harness would not let defendant take his belongings from the trunk, but did apologize to defendant and offered to take him back to his motel.

Defendant agreed, but insisted upon driving because Harness was intoxicated. Harness approved, and the men left. A few blocks from the motel, he stopped the vehicle at a stop sign. A police car was nearby. Harness jumped out, saying something defendant could not understand.

Defendant said he panicked, drove off and eventually abandoned the vehicle because he was afraid of going to jail for hitting Harness. His fear was based, in part, upon his past experiences which included convictions of battery, burglary and theft.

A second officer who was at the scene when Harness left his vehicle was of the opinion Harness was intoxicated, nearly to the extent of being arrested for public drunkenness. Harness told this officer defendant beat him up while the two men were driving around looking for women. Harness's girlfriend of 10 years testified he was a heterosexual. However, she also testified he did not drink and had not done so for two and a half years.

## I.

### USE OF PRIOR CONVICTION OF BATTERY UPON A POLICE OFFICER FOR IMPEACHMENT.

Defendant testified, and the prosecution used a prior conviction of battery upon a police officer (§ 243, subd. (c)), among other felonies, to impeach him. The trial judge ruled the prior conviction of battery upon a police officer involves moral turpitude. ▉ Defendant urges that battery upon a police officer does not involve moral turpitude within the meaning of the seminal case of *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111].

After passage of Proposition 8 (Cal. Const., art. I, § 28, subd. (f)), which provides prior felony convictions may be used without limitation for im-

peachment purposes, the Supreme Court, in *People* v. *Castro, supra,* set forth guidelines for trial courts when implementing the new constitutional provision. ■ ■ We summarized the *Castro* rule in *People* v. *Mansfield* (1988) 200 Cal.App.3d 82 [245 Cal.Rptr. 800]: "Pursuant to *People* v. *Castro, supra,* 38 Cal.3d 301, and subject to the trial court's discretion under Evidence Code section 352, only prior felony convictions that necessarily involve moral turpitude may be used to impeach a witness in a criminal proceeding. (*Id.* at p. 306.) 'Moral turpitude' means a general ' "readiness to do evil" ' (*id.* at p. 314), i.e., 'an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen, or to society in general, contrary to the accepted and customary rule of right and duty between man and man.' (*In re Craig* (1938) 12 Cal.2d 93, 97 [82 P.2d 442]; 2 Bouvier's Law Dict. (3d rev. 1914) p. 2247; 1 Witkin, Cal. Procedure (3d ed. 1985) Attorneys, § 375, pp. 424-426; see also Annot. (1975) 23 A.L.R.Fed. 480, 488, involving exclusion or deportation of aliens under Federal Immigration and Naturalization Act.) *Castro* makes no attempt to list or define those felonies which involve moral turpitude, but it makes clear that moral turpitude does not depend on dishonesty being an element of the felony. '[I]t is undeniable that a witness' moral depravity of *any kind* has some "tendency in reason" (Evid. Code, § 210) to shake one's confidence in his honesty.' (*People* v. *Castro, supra,* 38 Cal.3d at p. 315; italics added.)

"Finally, *Castro* holds that in deciding whether a felony offered for impeachment necessarily involves moral turpitude, the trial court may look only to the 'least adjudicated elements' of the crime for which the witness was previously convicted. (*Id.* at p. 317.) This concept simply means that in determining whether a previous felony involves moral turpitude the court cannot go behind the conviction and take evidence on or consider the facts and circumstances of the particular offense. Instead, the court must look to the statutory definition of the particular crime and only if the least adjudicated elements of the crime necessarily involve moral turpitude is the prior conviction admissible for impeachment purposes. (*People* v. *Statler* (1985) 374 Cal.App.3d 46, 53 [219 Cal.Rptr. 713].)" (*People* v. *Mansfield, supra,* 200 Cal.App.3d at p. 87.)

Section 242 defines battery as follows: "A battery is any willful and unlawful use of force or violence upon the person of another."

■ In the case of simple battery, any force against the person is sufficient for a conviction. There need be no proof of an intent to injure, only an intent to commit the act. ■ It has been held that a readiness to do evil is not necessarily shown in a conviction of simple battery. Similarly, it has been held simple battery does not necessarily involve moral turpitude.

(*People* v. *Mansfield, supra,* 200 Cal.App.3d at p. 88; *People* v. *Cavazos* (1985) 172 Cal.App.3d 589, 594 [218 Cal.Rptr. 269]; see generally, 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against the Person, § 404, pp. 466-467.)

Section 243, subdivision (c), in pertinent part, defines battery upon a peace officer: "(c)   When a battery is committed against a peace officer . . . engaged in the performance of his or her duties, whether on or off duty, including when the peace officer is in a police uniform and is concurrently performing the duties required of him or her as a peace officer while also employed in a private capacity as a part-time or casual private security guard or patrolman . . . and the person committing the offense knows or reasonably should know that the victim is a peace officer . . . engaged in the performance of his or her duties . . . and an injury is inflicted on that victim, the battery is punishable by imprisonment in the county jail for a period of not more than one year, or by a fine of not more than two thousand dollars ($2,000), or by imprisonment in the state prison for 16 months, or two or three years."

In *Mansfield, supra,* 200 Cal.App.3d 82, we held section 243, subdivision (d), felony battery (simple battery which results in serious bodily injury) did not involve moral turpitude. If the crime was committed, we reasoned, it was because of proof of the actual injury inflicted, not the means of force used. As a result, the perpetrator may have the same state of mind when committing simple battery or battery which causes serious bodily injury to the victim.

Because simple battery did not involve moral turpitude, we concluded felony battery which results in serious bodily injury was similarly not a crime involving moral turpitude. Both crimes could result from the "least touching." (200 Cal.App.3d at p. 88.)

We set forth the following analysis as a preface to our conclusion in *Mansfield*: "[T]he least adjudicated elements of battery resulting in serious bodily injury do not necessarily involve force *likely* to cause serious injury. Again, since it is the least adjudicated elements of a crime which are looked to in determining whether the crime is one of moral turpitude, and the crime at issue on this appeal can occur from the least offensive 'push,' it is not a crime of moral turpitude. This conclusion that battery resulting in serious bodily injury does not involve moral turpitude accords with common sense and generally accepted community standards. The average person walking down the street would not believe that someone who pushes another is a culprit guilty of moral laxity or 'general readiness to do evil,' even if the push was willful and results in serious injury." (*People* v. *Mansfield, supra,* 200 Cal.App.3d at pp. 88-89.)

■ In *People* v. *Elwell* (1988) 206 Cal.App.3d 171 [253 Cal.Rptr. 480], this court distinguished *Mansfield* and held aggravated assault, in violation of section 245, subdivision (a)(1), was a crime involving moral turpitude. The *Elwell* court relied, in part, upon an earlier decision of this court, *People* v. *Armendariz* (1985) 174 Cal.App.3d 674, 682 [220 Cal.Rptr. 229], in which we held assault with a deadly weapon (§ 245, subd. (a)(1)) is a crime of moral turpitude.

■ Battery upon a peace officer involves elements in addition to those necessary for a conviction of simple battery, or battery which causes serious injury: the willful and unlawful use of force must be: (1) upon a peace officer in the performance of his or her duties; and (2) the person committing the battery must know or reasonably should have known the victim of the battery was a peace officer. The latter element clearly involves a different mental state than that in *Mansfield*. Here, the act must likewise have been intended, but in addition the perpetrator must have known, or should have known, the victim was a peace officer in the performance of his or her duties.

The knowledge element of the crime of battery upon a peace officer (that defendant know or reasonably should have known the victim was a peace officer in the performance of his duties) clearly involves moral turpitude. There is no doubt the intentional, willful and unlawful use of force upon a peace officer, however slight, coupled with *actual* knowledge the victim is a peace officer in the performance of his or her duties, is clearly a crime of moral turpitude and demonstrates a readiness to do evil. However, even where the knowledge element is measured by a standard of reasonableness (should have known the victim was a police officer and should have known the victim was involved in his or her duties as a peace officer), moral turpitude or a readiness to do evil is present, inasmuch as the perpetrator's acts demonstrate a disregard for what is reasonably expected of ordinary people. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 780 [230 Cal.Rptr. 667, 726 P.2d 113].)

*People* v. *Rodriguez* is informative. The defendant in *Rodriguez* argued the death penalty could not be imposed upon a defendant who reasonably should have known the victim was a peace officer performing his or her official duty. The defendant argued the death penalty could only be imposed upon a defendant who actually knew the status of the victim of the intended killing. The Supreme Court ruled the death sentence in such cases was not excessive in severity since it served the social purposes of retribution and deterrence. (42 Cal.3d at p. 780.) As the court phrased the issue before it:

"[O]ur analysis of the peace-officer special circumstance must rest on the relationship between a defendant's criminal negligence with respect to knowledge of the officer's status, and either retribution or deterrence or both." (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 780.)

As to retribution, the court stated: "To fulfill the retributive goal, imposition of the death penalty 'must be tailored to [the defendant's] personal responsibility and moral guilt.' [Citation.] Would sentencing defendant to death because he should have known his victim was a peace officer 'measurably contribute to the retributive end of ensuring that the criminal gets his just desserts' (*ibid.*)?

"The electorate could reasonably conclude that . . . . [m]urders of this kind threaten the community at large by hindering the completion of vital public safety tasks; they evince a particular contempt for law and government, and they strike at the heart of a system of ordered liberty. Applying longstanding values, the electorate may reasonably conclude that an intentional murderer increases his culpability, already great, when he kills one whom he knew or should have known was a police officer performing his duties." (*Rodriguez, supra,* 42 Cal.3d at p. 781.)

The *Rodriguez* opinion was reaffirmed in *People* v. *Brown* (1988) 46 Cal.3d 432, 444 [250 Cal.Rptr. 604, 758 P.2d 1135]. The reasoning in *Rodriguez* is persuasive in the present case because in that case, as in the case before this court, the defendant must commit an intentional act upon someone he knew or should have known was a peace officer engaged in official duties. In *People* v. *Clarida* (1987) 197 Cal.App.3d 547 [249 Cal.Rptr. 363], the court observed, without accompanying analysis, that attempted battery with a deadly weapon and battery by a jail inmate were crimes of moral turpitude. The court concluded: "[A] fortiorari battery on a peace officer must also be a crime of moral turpitude. . . ." (*Id.* at p. 552.)

The Attorney General argues that the defendant did not properly object to admitting the prior conviction of battery upon a police officer for impeachment. In this regard, the record is somewhat muddled and we avoid an analysis of that issue by our conclusion that the conviction did involve moral turpitude and was properly admitted.

## II.   PROSECUTORIAL MISCONDUCT*

. . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Stone (W. A.), Acting P. J., and Ardaiz, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 13, 1989.

---

*See footnote, *ante*, page 849.