Filed 6/20/23  P. v. McClendon CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>YACUB MCCLENDON,<br><br>Defendant and Appellant. | F083850<br><br>(Super. Ct. No. DF012534A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Matthew J. Watts, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Yacub McClendon was in line for a diabetes check in prison when he told Correctional Officer Tapia to take him back to the holding cell and started screaming and acting aggressively towards Tapia.  Tapia took hold of defendant's right arm, but defendant twisted to the right and lunged forward with his right shoulder into Tapia's upper torso.  The impact knocked Tapia backwards, but he did not fall because he held onto defendant.  Defendant was restrained and placed in a holding cell.

Defendant was later taken from the holding cell to an empty office, where Lieutenant Robles and Officer Hunter took pictures for evidence and asked defendant if he wanted to give them any details about the incident.  Defendant was told he did not have to answer any of the questions and that he was free to go back to the holding cell.  Defendant said, "'I'm cool'" and explained he was mad at the medical staff and admitted he pushed Tapia and tried to get away because he was upset.  Defendant sought to exclude his statements from trial in a motion in limine, claiming they were taken in violation of *Miranda*,[1] but after a pre-trial hearing, the trial court concluded defendant was not in custody for purposes of *Miranda* and admitted his statements into evidence.

A jury convicted defendant of battery on a noninmate in violation of Penal Code section 4501.5.[2]  Following a bifurcated court trial, the court found true allegations defendant suffered five prior strike convictions.  Defendant was sentenced to 25 years to life.  Defendant filed a timely notice of appeal.

On appeal, defendant claims there was insufficient evidence to support the battery conviction, specifically that he willfully touched Tapia in a harmful or offensive manner.  Defendant also claims that his statements should have been excluded under *Miranda* because he was in custody for purposes of *Miranda*.  The People contend there was

---

[1]     See *Miranda v. Arizona* (1966) 384 U.S. 436.

[2]     Undesignated statutory references are to the Penal Code unless otherwise indicated.

2.

substantial evidence supporting his conviction and that defendant's statements were properly admitted. We agree with the People and affirm the judgment.

**FACTUAL BACKGROUND**

**I.      January 2016 Incident Involving Tapia**

On January 19, 2016, around 4:08 p.m., Correctional Officer Ricardo Lopez was working with Correctional Officer Robert Tapia at Kern Valley State Prison (KVSP) on the high level security Delta Yard, assigned to Building 2, Officer Floor 2. Every day there is a medical line for diabetics to check their blood sugar and inject themselves with insulin to control their blood sugar. Lopez's duty as a floor officer was to bring inmates to the medical office in the building, one at a time. The control officer opens the cell door to allow an inmate out to go to the medical office. The inmates are unrestrained when they go to the front of the medical office to get their treatment while the officers wait outside.

On January 19, 2016, defendant was the second inmate out for the medical line. He went to the front of the medical office where Officer Tapia was within arms reach of defendant and Officer Lopez was about a foot and a half to two feet away from him. After defendant approached the medical office, he said "Take me to the cage," which is a holding cell. Tapia gave him a direct order to return to his cell, but defendant yelled out loud "take me to the hole." This phrase means that defendant wanted to go to administrative segregation, which is a more secure facility. Officers do not make the decision about whether to take someone to administrative segregation. An inmate has to get permission from the sergeant. The officers did not ask defendant why he wanted to be placed in the hole.

Before making this statement, defendant had a blank expression, but then he started screaming out loud and acting aggressively towards Tapia. Tapia was next to defendant and was surprised when defendant yelled out like that and so he grabbed

3.

defendant's right arm quickly with his left hand. Defendant then twisted to the right and lunged forward into Tapia's upper torso with his right shoulder. Defendant did not pull away from Tapia, but moved towards Tapia and used his shoulder to push Tapia. After impact, Tapia's upper body went backwards. The only reason he did not fall was because he held onto defendant tightly. Officer Lopez observed defendant being resistant and aggressive, and saw defendant use his shoulder to make contact with Tapia quickly. Lopez characterized defendant's contact with Tapia as colliding, and hitting Tapia hard with his shoulder; not like a tap.

Lopez grabbed defendant's arm in order to restrain him, but defendant kept resisting and trying to break his grip. Tapia tried to help restrain defendant, but defendant leaned forward in an effort to take the officers forward with him. Subsequently, the officers employed physical force to bring defendant down to his stomach in an effort to stop his resistance. When defendant continued to resist, Lopez placed his right knee on defendant's back and handcuffed him. Lopez is trained to use this procedure to restrain an assaultive inmate. Lopez released defendant to responding staff members when they arrived.

Correctional Lieutenant Hector Robles worked with the Office of Internal Affairs within the California Department of Corrections and Rehabilitation (CDCR). On January 19, 2016, around 4:00 p.m., Robles received a request for assistance and reported to a back office room where defendant was brought in by Officer Hunter. Hunter took photographs of defendant and asked defendant a few questions—no more than four. Hunter told defendant that they were going to interview him, but that "if he did[ not] feel comfortable answering any questions or did[ not] want to answer any questions, that we could take him back to the location where he originally came from." Defendant responded, "'I'm cool. It's just town business.'"

Hunter asked defendant why the incident occurred and defendant responded, "Look, man, I've been trying to get this shit straight with my diabetes. The fucking

4.

doctors be acting like they don't want to give me medical attention. So I got mad and refused my medication. And was not ready to go back to the cell because that shit is fuckin' comical with the doctors." When Hunter asked defendant about being resistant with the staff, defendant responded, "I pushed that fool and tried to get away because I was fucking hot at this medical shit. These motherfuckers got this shot twisted. I'm ready to get locked up." Hunter did not ask any more questions after that and left with defendant. The time it took to take photographs and interview defendant was not more than 15–20 minutes.

Registered nurse Eva Claire Garrovillo, a supervising registered nurse at KVSP, examined Tapia on January 19, 2016. Tapia told her an inmate was resistive and he took the inmate to the ground and hit his knee on the concrete. Tapia said he hurt his knees and grazed his knuckles. Garrovillo observed abrasions on Tapia's knuckles and noted his knee was painful.

## II.      February 2016 Incident Involving Officer Rodriguez

On February 25, 2016, Correctional Officer Alberto Castellanos Rodriguez was working as a medical escort in the administrative segregation unit with KVSP. Rodriguez escorted defendant, in waist restraints, to the medical clinic within the housing unit for his daily diabetic shot around 4:00 p.m. Rodriguez kept his left hand cupped on defendant's right bicep while he escorted him because defendant was acting aggressive toward Rodriguez. Defendant told Rodriguez in an aggressive manner to "take your motherfucking hands off me, punk." Rodriguez explained that all inmates are to be escorted in a hands-on manner and that this was the same way he escorted defendant in the past. Defendant's demeanor became very aggressive and tense and he "clenched up his right forearm towards his bicep and trapp[ed Rodriguez's] left hand in between both …." Defendant's motion jerked Rodriguez up and knocked him off balance. Rodriguez took defendant's action as assault, placed his right arm on defendant's

5.

shoulder, spun him down to the ground, and landed on top of defendant to gain compliance. Rodriguez was able to free his hand, and let go of defendant as he fell down, but injured his right knee. Defendant continued resisting by kicking and flailing his legs until assistance arrived and placed leg restrains on defendant.

After the incident against Rodriguez, defendant was evaluated by Kira Gonzales, a psychiatric technician at KVSP. She was there to conduct a visual inspection for an injury report, but defendant did not cooperate and refused the unclothed body check. Garrovillo examined Rodriguez on February 26, 2016. Rodriguez's knee was red and swollen. It was tender to the touch, discolored, and warm.

### III. Charges and Verdict

Defendant was charged with committing battery on a noninmate, Tapia, on January 19, 2016 (§ 4501.5, count 1) and committing battery on a noninmate, Rodriguez, on February 25, 2016 (§ 4501.5, count 2). It was also alleged that defendant had served a prior state prison term and received a felony conviction within five years of being released (§ 667.5, subd. (b)) and had five prior serious felony strike convictions. The jury convicted defendant of the battery on Tapia and acquitted him of the battery on Rodriguez. In a bifurcated proceeding, the People offered a certified record of defendant's convictions from CDCR into evidence and the court found all strike allegations true. On December 3, 2021, defendant was sentenced to 25 years to life pursuant to the "Three Strikes" Law. (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d).)

### DISCUSSION

### I. Substantial Evidence Supports the Battery Conviction.

Defendant contends there was insufficient evidence to support his conviction of battery on Tapia. Specifically, defendant contends there was insufficient evidence he willfully touched Tapia in a harmful or offensive manner. The People disagree, stating there is ample evidence supporting an inference that defendant acted both willfully and

6.

that the touching was harmful or offensive.  We conclude there is substantial evidence from which a reasonable finder of fact could find beyond a reasonable doubt that defendant acted both willfully and that the touching was harmful or offensive.

### A.     Standard of Review

In assessing a case for sufficiency of the evidence, the standard of review is whether "'on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; accord, *People v. Johnson* (1980) 26 Cal.3d 557, 576–578; *People v. Jones* (1990) 51 Cal.3d 294, 314; *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.)  "'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.] … We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.'" (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293, quoting *People v. Lindberg* (2008) 45 Cal.4th 1, 27; see *Jones, supra*, at p. 314 [appellate courts "must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence"].)  A reviewing court "must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)  "'If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]  A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*D'Arcy, supra*, at p. 293, quoting *Lindberg, supra*, at p. 27; see *People v. Bolin* (1998) 18 Cal.4th 297, 331 [reversal unwarranted unless it appears under "'"no hypothesis whatever is there sufficient substantial evidence to support [the conviction]"'"]; *People v. Redmond* (1969) 71 Cal.2d 745, 755 [same].)

**B.     Applicable Law**

Section 4501.5 reads:  "Every person confined in a state prison of this state who commits a battery upon the person of any individual who is not himself a person confined therein shall be guilty of a felony and shall be imprisoned in the state prison for two, three, or four years, to be served consecutively."

To prove battery on a nonconfined person, the prosecutor must present evidence that a defendant:  1) willfully touched the victim in a harmful or offensive manner; 2) the defendant was serving a sentence in state prison; 3) the victim was not serving a sentence in state prison; and 4) the defendant did not act in self-defense.  (§ 4501.5; accord, CALCRIM No. 2723.)  As to the first factor, courts have frequently "reiterated the long-standing rule that battery is a general intent crime."  (*People v. Lara* (1996) 44 Cal.App.4th 102, 107 (*Lara*).)  "Thus, the crime of battery requires that the defendant actually intend to commit a 'willful and unlawful use of force or violence upon the person of another.'"  (*Ibid*.)  In the context of battery, willfully means "'simply a purpose or willingness to commit the act ….'"  (*Ibid.*)

Additionally, "[i]n the case of simple battery, any force against the person is sufficient for a conviction. There need be no proof of an intent to injure, only an intent to commit the act."  (*People v. Lindsay* (1989) 209 Cal.App.3d 849, 855.)  The slightest degree of touching is sufficient.  (*People v. Myers* (1998) 61 Cal.App.4th 328, 335; *In re B.L.* (2015) 239 Cal.App.4th 1491, 1495.)  "'It has long been established that "the least touching" may constitute battery.  In other words, force against the person is enough; it need not be violent or severe, it need not cause bodily harm or even pain, and it need not leave a mark.'"  (*People v. Shockley* (2013) 58 Cal.4th 400, 404, as modified on denial of rehg. (Feb. 26, 2014); accord, *People v. Hernandez* (2011) 200 Cal.App.4th 1000, 1006 ["Even a slight touching may constitute a battery, 'if it is done in a rude or angry way.'"].)

8.

## C.    Analysis

Defendant claims the evidence his shoulder bumped Tapia in the chest was insufficient to establish he committed battery.  Rather, he argues, the evidence shows he was twisting to get away and that resultant touch was not a "'willful'" touch.  Defendant also argues the contact was not "'harmful or offensive'" because Tapia initiated the contact when he grabbed defendant's arm.  The People disagree, contending the evidence shows defendant deliberately and forcefully drove his shoulder into Tapia's chest, supporting an inference that he acted willfully and that the touching was harmful or offensive.  Upon review of the record, we agree with the People and conclude there is substantial evidence from which a reasonable trier of fact could find the defendant guilty of battery beyond a reasonable doubt.

Since defendant only challenges the sufficiency of the evidence supporting the first element of his conviction, our analysis focuses on whether substantial evidence supports the finding that defendant willfully touched Tapia in a harmful or offensive manner.  "The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to.  It does not require any intent to violate law, or to injure another, or to acquire any advantage."  (§ 7, subd. 1.)

Here, there was sufficient evidence from which a rational factfinder could conclude defendant purposely lunged at Tapia and, thus, willfully touched him with his right shoulder.  (See *Lara, supra*, 44 Cal.App.4th at p. 107.)  Defendant was already screaming and acting aggressively towards Tapia, saying "take me to the hole," when Tapia grabbed defendant's right arm.  Defendant then twisted and lunged forward with his right shoulder into Tapia's torso.  Defendant did not pull away from Tapia, but lunged towards Tapia in a fast manner that was described as a push.

There is also sufficient evidence in the record the touching was harmful or offensive.  Tapia testified defendant twisted and aggressively lunged forward with his

right shoulder into Tapia's torso. Officer Lopez observed defendant use his shoulder to push Tapia fast, and with enough force that Tapia was pushed backwards. The contact was described as a collision, like hitting someone hard with their shoulder, and not like a tap. Lopez explained the only reason Tapia did not fall backwards as a result of impact was because Tapia was holding onto defendant. Tapia stated he took defendant to the ground because defendant had just "hit" or "assaulted" him. According to Tapia, the control officer called a code 1, signaling a "[r]esistive inmate, fighting" or "violent activity." Considering that ""the least touching" may constitute battery,'" and that "'it need not be violent or severe,'" the record contains substantial evidence supporting the jury's finding that defendant's touch was willful and harmful or offensive. (See *People v. Shockley*, *supra*, 58 Cal.4th at p. 404, quoting 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against the Person, § 13, p. 804; see also *People v. Rocha* (1971) 3 Cal.3d 893, 899, fn. 12 [same].)

Moreover, defendant's own statements demonstrate he willfully touched Tapia in a harmful or offensive manner. Defendant told Officer Hunter and Lieutenant Robles that he "pushed that fool and tried to get away." We also note that defendant concedes in his opening brief that he "reacted to Officer Tapia's grasp by pushing him away." Therefore, there is substantial evidence from which a reasonable jury could find defendant knew what he was doing and intentionally bumped into Tapia when he lunged towards Tapia with his shoulder.

The First District Court of Appeal, Division Two's decision in *People v. Kaiser* (1980) 113 Cal.App.3d 754 further supports our conclusion. In *Kaiser*, the defendant also claimed there was insufficient evidence to establish a battery on a custodial officer. (*Id*. at p. 767.) The defendant inmate was being resistant, and officers moved in to restrain him. "Officer DeShay grabbed one of [the defendant's] legs, but it slipped away. DeShay was kicked in the right shin area before regaining hold of [the defendant's] leg." (*Ibid*.) The *Kaiser* court concluded the evidence of battery was "plainly sufficient" under

10.

the circumstances. (*Id*. at p. 768.) Similarly here, we conclude the evidence of battery was plainly sufficient where defendant twisted to get away and lunged his right shoulder into Tapia's chest, admittedly to push him away.

However, defendant's reliance on the First District Court of Appeal, Division Two's decision in *People v. Francis A.* (2019) 40 Cal.App.5th 399 (*Francis A.*) is less on point. In *Francis A.*, the defendant, "Frank," was on the phone when the school resource officer Stahler put his hand on Frank's back. Frank moved his right arm back while moving his body away to escape the touch. In doing so, the defendant "lightly brushed Stahler's hand with his right elbow or upper arm." (*Id*. at pp. 401, 402, 403, 406.) The court concluded "Stahler initiated physical contact from which Frank tried to get away, and Frank's brushing of Stahler's hand was incidental to his attempt to move away from Stahler's hand. There was no substantial evidence that Frank acted *willfully* to touch Stahler at all. Stahler's testimony established that Frank's arm brushed his hand but not that he did so intentionally." (*Id*. at p. 406.)

Defendant argues that like in *Francis A.*, he "'did not commit a battery because he came in contact with [Tapia's torso] as the result of "a reflective motion" upon being touched' and reacting to that." (See *Francis A., supra*, 40 Cal.App.5th at p. 404.) Defendant also argues that Tapia initiated contact by placing his hand on defendant to guide him and that defendant, in the process of trying to get free, "did not consider that it might result in a collision" with Tapia. However, a reasonable factfinder could conclude the touching at issue here was not akin to a light brush or contact incidental to moving away, like in *Francis A.*, but instead an intentional act by defendant twisting and aggressively lunging forward with his shoulder into Tapia's torso. As described above, there was evidence defendant lunged towards Tapia in a fast manner, not away from Tapia. And defendant himself admitted he pushed Tapia. Moreover, unlike in *Francis A.*, where the defendant was a student not wanting to be touched by the school resource officer, here, defendant is an inmate who was being touched by a custodial

11.

officer and did not have a right to use force to avoid contact. "'A custodial officer may use reasonable force in his duties to restrain a person, to overcome resistance, to prevent escape, or in self-defense. [¶] If a person knows or reasonably should know that a custodial officer is restraining him, that person must not use force or any weapon to resist an officer's use of reasonable force.'" (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 521.)

Therefore, we conclude there is substantial evidence from which a reasonable tier of fact could find beyond a reasonable doubt that defendant's actions were willful and that the touching was harmful or offensive.

## II. Defendant's Statements Were Not Taken in Violation of *Miranda*

Defendant contends the trial court should have excluded his statements to Officer Hunter and Lieutenant Robles, arguing he was taken into custody and his statements were taken in violation of *Miranda*. The People disagree, contending defendant was not in custody for purposes of *Miranda*. We agree with the People.

### A. Relevant Procedural History

On October 21, 2021, the People filed a trial brief in which the district attorney argued that defendant was not in custody and a *Miranda* advisement was not required. The People explained that "the defendant was told he did not have to answer any questions and if he did not want to answer any questions that the interview would be immediately terminated, and he would be returned to the holding cell." On the same day, defendant filed a motion in limine to exclude his statements. In the motion in limine, defendant sought a hearing asserting the protections of *Miranda* applied "not only to direct custodial interrogation but also to police conduct which is designed to elicit an incriminating response."

A *Miranda* hearing was held on October 25, 2021. Lieutenant Robles testified that he and Officer Hunter interviewed defendant in an empty office with desks and chairs, which had one door and at least two to three windows. The door to the interview

12.

room was closed for privacy, and defendant was in either handcuffs or waist restraints. The interview was not recorded; Robles took notes while Hunter interviewed defendant. Robles testified that he and defendant were calm during the interview, and that Hunter was calm, respectful, and professional. Hunter told defendant they needed "to take photographs for evidentiary purposes, and also to ask him any details he[ was] willing to disclose about the incident …." Hunter told defendant if he did not want to answer any questions, "he'd be free to take him back to the holding cell area." Defendant responded, "'I'm cool. It's just town business.'" Hunter asked defendant to explain any details about the incident in the building. Defendant responded, "'Look, man, I've been trying to get this shit straight with my diabetes. The fucking doctors be acting like they don't want to give me medical attention; so I got mad and refused my medication and was not ready to go back to the cell because this shit is fucking comical with the doctors. You feel me?'" Hunter asked defendant why he resisted the officers. Defendant responded, "'I pushed that fool and tried to get away 'cause I was fucking hot at this medical shit. These motherfuckers got this shit twisted. I'm ready to get locked up.'" Robles interpreted this as defendant wanting to terminate the interview. At this point, the interview was terminated.

At some point pictures were taken of defendant. Robles could not recall when this occurred, but traditionally the pictures would have been taken first. He testified that the interview portion of the contact could not have taken more than five to seven minutes. After the interview, Hunter escorted defendant to a holding cell. Hunter did not move defendant to administrative segregation, and was not sure whether he went there, but said "[a]fter a situation like that, the next step would be to rehouse him in Administrative Segregation and that's kind of more the way I understood it, he's ready for the next step of whatever the process is that's being taken."

The trial court ultimately found that the temporary restriction placed on defendant did not rise to the level of being in custody for purposes of *Miranda* and, therefore, a

13.

*Miranda* warning was not necessary. The trial court noted there is a procedure followed when alleged incidents occur, like defendant here, where defendant was temporarily placed in the holding cell and then photographed for evidentiary purposes and interviewed if they wished. The court found significant that "defendant was advised that he was not in custody for purposes of the investigation based on what was relayed to him, that he did not have to answer any questions, and that he was free to go back to the holding cell area."

### B.      Relevant Law and Standard of Review

"The Fifth Amendment, which applies to the States by virtue of the Fourteenth Amendment, [citation], provides that '[n]o person … shall be compelled in any criminal case to be a witness against himself.'" (*Maryland v. Shatzer* (2010) 559 U.S. 98, 103 (*Shatzer*).) "In *Miranda* …, the Court adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation." (*Ibid.,* quoting *Miranda, supra*, 384 U.S. at p. 467.) "*Miranda* announced that police officers must warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney." (*Shatzer, supra*, at pp. 103–104.)

*Miranda* is to be strictly enforced, "but only in those types of situations in which the concerns that powered the decision are implicated." (*Berkemer v. McCarty* (1984) 468 U.S. 420, 437.) "[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question." (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.) "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" (*Ibid.*)

The United States Supreme Court explained "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." (*Howes v. Fields* (2012) 565 U.S. 499, 508–509 (*Fields*).) Whether a defendant is "'in custody'" for purposes of *Miranda* is a mixed question of law and fact.

14.

(*Thompson v. Keohane* (1995) 516 U.S. 99, 112–113, superseded by statute (28 U.S.C. § 2254(d)); accord, *People v. Leonard* (2007) 40 Cal.4th 1370, 1400 (*Leonard*).)

The reviewing court applies "'a deferential substantial evidence standard' [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, 'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave' [citation]." (*Leonard, supra*, 40 Cal.4th at p. 1400; *People v. Davidson* (2013) 221 Cal.App.4th 966, 970 [reviewing court defers to the trial court's findings supported by substantial evidence and independently determines whether the defendant was in custody for *Miranda* purposes].) The reviewing court's analysis is based solely on those facts that were adduced at the suppression hearing. (*People v. Hartsch* (2010) 49 Cal.4th 472, 491; *People v. Garry* (2007) 156 Cal.App.4th 1100, 1105, fn. 2; *People v. Gibbs* (1971) 16 Cal.App.3d 758, 761.)

### C.     Analysis

The United States Supreme Court has extended *Miranda* safeguards to inmates in a prison setting. (*Mathis v. United States* (1968) 391 U.S. 1, 4.) In *Fields*, the Supreme Court clarified that "imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*." (*Fields, supra*, 565 U.S. at p. 511.) Rather, "[w]hen a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation. These include the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted." (*Id*. at p. 514; see *People v. Macklem* (2007) 149 Cal.App.4th 674, 692 [when a defendant is "already under detention in a custodial facility" at the time of an interview, the relevant question is whether there is "an additional degree of 'formal arrest or restraint on freedom of movement'"].) "In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of 'the objective circumstances of the interrogation,'

[citation], a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" (*Fields, supra*, at p. 509.) That being said, "[c]onfessions voluntarily made by prisoners in other situations should not be suppressed." (*Id.* at p. 514.) "Voluntary confessions are not merely 'a proper element in law enforcement,' [citation], they are an 'unmitigated good,' [citation], '"essential to society's compelling interest in finding, convicting, and punishing those who violate the law,"' [citations]." *Shatzer, supra*, 559 U.S. at p. 108.)

In *Fields*, the United States Supreme Court weighed several factors to consider in determining whether the prisoner was taken into custody for purposes of *Miranda* during an in-prison interview. (*Fields*, *supra*, 565 U.S. at p. 517.) The factors that were considered in support of "custody" were that the defendant "did not invite the interview or consent to it in advance"; "he was not advised that he was free to decline to speak with the deputies"; the interview lasted between five and seven hours long in the evening, after the hour when the defendant typically went to bed; the questioning deputies were armed; and one deputy "'[u]sed a very sharp tone'" as well as profanity. (*Id*. at p. 515.) However, these circumstances were "offset" by factors that did not indicate defendant was in custody: the defendant was not physically restrained or threatened; he was interviewed in a "well-lit, average-sized conference room, where he was 'not uncomfortable'"; he was offered food and water; and the door to the conference room was "sometimes" left open. (*Ibid*.) "Most important," the defendant "was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted." (*Ibid*.) The *Fields* court reasoned, "[t]aking into account all of the circumstances of the questioning—including especially the undisputed fact that [the defendant] was told that he was free to end the questioning and to return to his cell—we hold that [the defendant] was not in custody within the meaning of *Miranda*." (*Id*. at p. 517.)

16.

As in *Fields*, the circumstances surrounding the questioning here demonstrates that defendant was not in custody for purposes of *Miranda*. First, there were only a few factors that weighed towards defendant's position that he was taken into custody: defendant was in restraints during the interview and the door to the room was closed. Conversely, there are several factors surrounding the interview demonstrating that defendant was not in custody. Although the door to the room where defendant was questioned was closed, it was not a designated interrogation room, but an office space with desks and had two to three windows. At the beginning of the interview, defendant was advised he was free to decline to speak and that he could return to the holding cell. Defendant consented to the interview by saying "'I'm cool.'" The interview was short. The officers only asked a few questions, which took about five to seven minutes. There was no evidence the officers used harsh or sharp tones to speak with defendant, but that all parties were calm. (See *Fields, supra*, 565 U.S. at p. 515.) There was also no evidence that the officers were confronting defendant with evidence against him, as defendant suggests. The officers made two open-ended inquiries of defendant, asking for "any details he's willing to disclose about the incident" and "why he resisted the officers." Further, when defendant said "'I'm ready to get locked up,'" the officers interpreted his statement as not wanting to answer any more questions. The officers responded by stopping the interview and taking defendant back to the holding cell. Thus, by their actions, the officers proved the truth of their statement that defendant did not have to answer any questions and was free to leave the room.

Defendant cites to *In re Hutchinson* (1972) 23 Cal.App.3d 337, 341 to argue that he was not granted a modicum of freedom by ending the interview, but placed in the most restrictive part of the facility. In *Hutchinson*, the issue before the court was that the defendant was placed in maximum security for a duration that was deemed excessive and where prison authorities could offer no facts justifying his continued segregation. (*Ibid.*) That is not the case here. Defendant was brought to the interview from the holding cell

17.

and was told he could return to the holding cell if he did not wish to answer questions. Thus, defendant was returned to the same location, with the same level of restriction, where he was before the interview. There is no evidence in the record that defendant was penalized with more restrictive housing by not answering questions.

Therefore, upon an independent review of the record, especially acknowledging that defendant was told he was free to end the questioning and return to the holding cell, we conclude defendant was not in custody for *Miranda* purposes. (See *Fields, supra*, 565 U.S. at p. 517.)

## DISPOSITION

We affirm the judgment.


MEEHAN, J.

WE CONCUR:


DETJEN, Acting P. J.


DeSANTOS, J.